IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO LAWYERS' COMMITTEE FOR | ) | |
| CIVIL RIGHTS UNDER THE LAW, INC. | ) | |
| | ) | Judge Amy J. St. Eve |
| Plaintiff, | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| CRAIGSLIST, INC., | ) | Case No. 06 C 0657 |
| | ) | |
| Defendant. | ) | |

**BRIEF OF AMICUS CURIAE NATIONAL FAIR HOUSING ALLIANCE
IN SUPPORT OF PLAINTIFF**

The National Fair Housing Alliance ("NFHA") respectfully submits this brief *amicus curiae* in support of Plaintiff in this case.

*Interest of Amicus Curiae*

The National Fair Housing Alliance ("NFHA") is a non-profit corporation that represents approximately eighty-five private, non-profit fair housing organizations throughout the country. NFHA was founded in 1988 to lead the battle against housing discrimination and ensure equal housing opportunity for all people. Through education, outreach, policy initiatives, advocacy and enforcement, NFHA promotes equal housing, lending and insurance opportunities. Relying on the Fair Housing Act, NFHA and its members have undertaken important enforcement initiatives in cities and states across the country; those efforts have contributed significantly to the nation's efforts to eliminate discriminatory housing practices.

*Introduction*

Congress explicitly stated that its purpose in passing the Fair Housing Act of 1968 ("FHA") was "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601 (1970). It is clear from the legislative history that Congress enacted the FHA to encourage residential integration and to eliminate barriers to housing choice. Indeed, the FHA's "very broad reach" was recognized as an "attempt to alter the whole character of the housing market." *Mayers v. Ridley*, 465 F.2d 630, 652 (D.C. Cir. 1972) (en banc) (Wilkey, J. concurring).

Discrimination in housing, however, continues to persist. "Housing in the United States continues to be characterized by extremely high levels of racial segregation," Robert G. Schwemm, *Housing Discrimination: Law and Litigation* § 2:1(2003), and racial, ethnic, and religious minorities, in addition to families with children, are still limited in their housing options because of the discriminatory attitudes of others. A 1991 study concluded that, "black and Hispanic homeseekers experience discrimination roughly half of the times that they visit a rental or sales agent to inquire about advertised housing opportunities." M. Turner*, Discrimination in Urban Housing Markets: Lessons from Fair Hous. Audits* 3 Housing Policy Debate 185, 188 (1991):

> There can be no doubt that the stubborn persistence of segregation is partly the result of discriminatory housing market practices – practices that create barriers to minority housing search and location choice, that discourage minority homeseekers from obtaining housing in predominately white neighborhoods, and that prevent some white homeseekers from considering housing opportunities in racially mixed or minority neighborhoods. *Id.*

The advertisements for housing found on craigslist contain statements such as "No Minorities," "African Americans and Arabians tend to clash with me so that won't work out," "Christian straight single female needed," and "Sorry, no kids * * *." They are stark examples of the blatant discrimination that persists more than three decades after the 1968 Fair Housing Act banned such behavior. The statements contained in the advertisements on craigslist are not an aberration. Reported cases from across the country contain numerous examples of housing providers who have made similar discriminatory statements and racial slurs.[1]

Discriminatory advertisements are especially pernicious because they block prospective renters and buyers from even applying and having a chance to compete equally for housing. Discriminatory advertisements or statements on the Internet compound the problem. Discriminatory advertisements contained on the Internet are seen by a much broader audience than that which seeks housing information in the print media. There were up to 335,126 real estate listings on craigslist alone in March 2006. *See* James R. Hagerty & Kevin J. Delaney,

---

[1]     See e.g. *Lousiana Acorn Fair Hous. v. Leblanc*, 211 F.3d 298, 299-300 (5th Cir. 2000) (landlord told African American applicant that he did not rent to "you people" and "black, colored, Negro, whatever you call yourself, I don't rent to y'all); *Harris v. Itzhaki*, 183 F.3d 1043, 1048 (9th Cir. 1999) (agent told staff in front of African American tenant "Owners don't want to rent to Blacks"); *Allahar v. Zahora*, 59 F.3d 693, 694 (7th Cir. 1995) (homeseller told Middle Eastern applicant, "[I've] talked to my neighbors and they don't want a nigger on the block.").

*Google, craigslist Expand into Real Estate*, Wall St. J., Apr. 6, 2006, at D1; attached as Ex. 1. By contrast, the average daily *Chicago Tribune* readership is about 1,858,767 people. Chicago Tribune, at: http://classified.tribune.com/ctadvertiserwebsite/ circulation.htm.

NFHA is dedicated to vigorously enforcing the FHA in order to effectuate its purpose. Because of the shift away from newspaper classifieds and towards on-line advertisements, an essential component of effective FHA enforcement is the imposition of liability under § 3604(c) upon websites such as craigslist that publish discriminatory housing advertisements. Amicus therefore files this brief in support of plaintiffs, urging that craigslist's motion for judgment on the pleadings be denied.

SUMMARY OF ARGUMENT

Section 3604(c) of the FHA is extremely broad in scope, prohibiting the expression of discriminatory preferences in connection with the sale or rental of housing in all but the most limited circumstances. Although there is nothing in § 3604(c)'s text, legislative history or purpose to support its position, craigslist nonetheless argues that it cannot be liable for the numerous advertisements violating § 3604(c) because of an immunity provision found in § 230(c)(1) of the Communications Decency Act ("CDA"). The question for this Court is whether to extend CDA immunity to violations of the FHA made by publishers who publish or print discriminatory advertisements written by a third party.

In this brief, NFHA shows that § 3604(c) explicitly holds publishers liable for § 3604(c) violations. The text, legislative history, and purposes of § 3604(c) consistently point to liability. As a general matter, "[t]he language of the Act is broad and inclusive." *Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 209 (1973). Section 3604(c) imposes a legal obligation to avoid making, printing or publishing "any notice, statement or advertisement with respect to the sale or rental of a dwelling" that indicates any "preference, limitation or discrimination." See 42 U.S.C. § 3604(c).

A generous construction of § 3604(c) is consistent with the purposes of the FHA. The broad statutory language of § 3604(c) is the result of the purposes behind the FHA and the factual context of the discrimination addressed by the Act. The FHA begins by declaring that "[i]t is the policy of the United States to provide, within constitutional limitations for fair housing throughout the United States." 42 U.S.C. § 3601. In pursuit of this policy, Congress sought to deter discriminatory housing practices, to compensate victims of discrimination and to

support desegregation. The ban on discriminatory notices, statements, or advertisements of §
3604(c) furthers the purposes of the FHA by reducing barriers that might deter persons in the
protected classes from even seeking homes in neighborhoods that must be open to them under
the FHA and by banning practices that might create the impression that segregation in housing is
legal.

Moreover, holding those who publish or print discriminatory advertisements such as
newspapers liable for violations of § 3604(c) is wholly consistent with the jurisprudence of the
FHA. Given the immense volume of housing advertisements found on the Internet, the broad
ends of the FHA cannot be achieved if websites such as craigslist are considered immune from
its coverage.

*ARGUMENT*

The Fair Housing Act was enacted "to provide, within constitutional limitations, for fair
housing throughout the United States." 42 U.S.C. § 3601. The FHA prohibits discrimination in
specified activities in all aspects of a transaction related to the sale, rental, or financing of
dwellings. *See* 42 U.S.C. §§ 3604-6, and 3617. The principles embodied in the FHA reflect a
"policy that Congress considered to be of the highest priority." *Trafficante*, 409 U.S. at 211-12.

In this action, plaintiff alleges that craigslist published and printed discriminatory
advertisements over the Internet that indicate a clear preference, limitation or discrimination
based on the classes protected under the FHA. The FHA imposes liability for such
discriminatory notices, statements or advertisements under § 3604(c).

1. *The Statutory Language*

Section 3604(c) makes it unlawful:

> [t]o make, print, or publish, or cause to be made, printed, or published any notice,
> statement, or advertisement, with respect to the sale or rental of a dwelling that
> indicates any preference, limitation, or discrimination based on race, color,
> religion, sex, handicap, familial status, or national origin, or an intention to make
> any such preference, limitation, or discrimination.

42 U.S.C. § 3604(c).

The text of a statute is "[t]he starting point in every case involving the construction of a
statute." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197 (1976) (internal quotation omitted).
The operative sections of § 3604(c) state that it is unlawful to "make, print or publish" any

discriminatory "notice, statement or advertisement."  Section 3604(c) provides that printers or publishers are liable for publishing or printing discriminatory advertisements or statements.

"[T]he protection of the benefited class" is the "unmistakable focus" of the statutory language of § 3604(c).  *Cannon v. Univ. of Chicago*, 441 U.S. 677, 691 (1979).  Because the text is directed to the rights of a protected class, it is most naturally read as extending liability to any person responsible for making, printing, or publishing discriminatory statements or advertisements.

The Supreme Court has previously recognized that "the language of the Act is broad and inclusive," *Trafficante*, 409 U.S. at 209, and has repeatedly stated that the Act should be given a "generous construction."  *City of Edmonds v. Oxford House, Inc*., 514 U.S. 725, 731 (1995) (*quoting Trafficante*, 409 U.S. at 212).  In *City of Edmonds*, the Court narrowly construed an exception to the FHA's coverage based on the general rule that the Act should be construed generously to serve its purpose of preventing and remedying discriminatory housing practices. The Court stated that it regarded the case "as an instance in which a general statement of policy is sensibly read narrowly in order to preserve the primary operation of the policy."  *Id.* at 731-32 (internal quotation omitted).

Accordingly, the FHA should instead be given a generous construction to provide for liability under § 3604(c) where doing so would "preserve the primary operation of the Act's policy."  *Id.* at 732.  Specifically, the Court should hold any person or entity who makes, prints or publishes a notice, statement or advertisement with respect to the sale or rental of a dwelling which indicates a preference, limitation or discrimination responsible for a violation of § 3604(c).

  2.  *An Expansive Reading of Section 3604(c) is Consistent with the Goals of The FHA.*

The imposition of liability on those who make, print or publish discriminatory notices, statements or advertisements is necessary to achieve the legislative purposes of the FHA. Congress intended to achieve fair housing "throughout the United States" by deterring discrimination, supporting desegregation and compensating victims.  42 U.S.C. § 3601.

Supporters of the FHA in both the House and Senate repeatedly argued that the new law should both expand housing choices for minorities and foster racial integration.  For example, Senator Mondale, the principal sponsor of the FHA, stated that "the basic purpose of [fair

housing] legislation is to permit people who have the ability to do so to buy any house offered to the public if they can afford to buy it."  114 Cong. Record 3421 (Feb. 20, 1968).  Senator Javits explained that housing discrimination is a "vital issue" and it was a "fundamental element of dignity that a man may enjoy [a good home in a good neighborhood] without hindrance."  114 Cong. Record 2703 (Feb. 8, 1968).

Integration was equally important to the Congress that passed the FHA in 1968.  Senator Mondale repeatedly expressed the concern that "we are going to live separately in white ghettos and Negro ghettos."  114 Cong. Rec. 2276 (Feb. 6, 1968).  Senator Mondale explained that the purpose of the FHA was to replace ghettos with "truly integrated and balanced living patterns." *Id*. at 3422 (Feb. 20, 1968).  Congressman Cellar, Chairman of the House Judiciary Committee, expressed the need to eliminate "the blight of segregated housing patterns."   *Id*. at 9959 (Apr. 10, 1968).  Senator Kennedy also stressed the need for Congressional action to address segregation:

> As long as the Negro American remains isolated from other Americans and denied equal access to good housing, he will continue to live in segregation, forced to pay a higher price for the limited inferior housing to which he does have access.  His children will continue to go to segregated schools of inferior quality, and his family will continue to experience segregation in most other aspects of their daily lives, cut off from the society that surrounds them.

*Hearings Before Subcomm. On Constitutional Rights of the S. Comm. On the Judiciary on S.3296, the Civil Rights Act of 1966, and Related Bills*, 89th Cong. 68 (1966).

Neither of the purposes of the FHA would have been achieved and the FHA might not have been enacted but for two events.  On March 1, 1968, the Kerner Commission released its highly publicized report, which warned that "America is dividing into two societies, black and white, separate and unequal."  See *Report of the National Advisory Commission on Civil Disorders* 1, 13 (1968).  The Report recommended that the government enact a comprehensive and enforceable open housing law covering the sale and rental of all property, including single family homes.  Jean E. Dubofsky, *Fair Housing: A Legislative History and A Pe*rspective, 8 Washburn L.J. 149, 158 (1969).  On April 4, 1968, Martin Luther King was assassinated.  On April 10 "with National Guard troops called up to meet riot conditions in Washington, still in the basement of the Capitol, the House debated fair housing."  *Id.* at 160.  President Johnson signed the Fair Housing Act into law on April 11, 1968*.  Id.*

The ban on discriminatory notices, statements and advertisements contained in Section 3604(c) is crucial to furthering the purposes of the FHA by reducing barriers that might deter persons in the protected classes from seeking homes in neighborhoods that must be open to them under the FHA. Courts have repeatedly recognized that discriminatory advertisements deter prospective renters and buyers before they can even get into the door to apply for a home. As the Fourth Circuit explained:

> Widespread appearance of discriminatory advertisements in the public or private media may reasonably be thought to have a harmful effect on the general aims of the Act: seeing large numbers of "white only" advertisements in one part of the city may deter nonwhites from venturing to seek homes there, even if other dwellings in the same area must sold or rent on a non-discriminatory basis.

*United States v. Hunter*, 459 F.2d 205, 214 (4th Cir. 1972).

Section 3604(c) also advances the goals of the FHA by banning practices that might create "a public impression that segregation in housing is legal." *Spann v. Colonial Vill.*, 899 F.2d 24, 30 (D.C. Cir. 1990). Discriminatory statements and advertisements are seen by both unsophisticated housing providers and home seekers as well as sophisticated ones. The continuing prevalence of discriminatory notices, statements and advertisements encourage housing providers and members of the protected classes to believe that discrimination in housing is the accepted norm, despite the FHA's ban on such practices. *See id.* Publication of discriminatory advertisements on the Internet amplifies the harm many times over as it allows thousands of people to see each discriminatory advertisement or statement.

The prohibitions of Section 3604(c), designed to further the perception that all housing is available on a non-discriminatory basis, are a necessary prerequisite to fulfilling the FHA's goals. The fulfillment of Congress' purposes behind the FHA requires a generous construction of § 3604(c) and strongly supports the imposition of liability upon those who make, print, or publish discriminatory notices, statements, or advertisements regardless of the medium of expression.

3. *Section 3604(c) Imposes Liability on Those Who Make, Print or Publish Discriminatory Notices, Statements or Advertisements*

The importance of § 3604(c) to furthering the goals of the FHA is reflected in the statutory language and the broad interpretation that the courts have consistently given to § 3604(c). Congress chose to make § 3604(c) apply to housing otherwise exempt from other

provisions of the FHA. 42 U.S.C. § 3604(b)(2). Furthermore, violations of § 3604(c) do not require discriminatory intent. *Jancik v Dep't of Hous. and Urban Dev.*, 44 F.3d. 553, 556 (7th Cir. 1995). Instead, the general standard for testing claims under section 3604(c) is the ordinary reader or listener test. *United States v. Hunter*, 459 F.2d 205, 215 (4th Cir.1972) (a violation of section 3604(c) is established whenever "[t]o the ordinary reader the natural interpretation" of the notice or statement is to "indicate a preference, limitation, or discrimination" prohibited by Section 804(c)).

It is well settled law that newspapers can be held liable for publishing discriminatory advertisements, *Ragin*, 923 F.2d 995; *Hunter*, 259 F.2d at 210. Indeed, this proposition has not been seriously disputed since 1972. In *Hunter*, the Fourth Circuit Court of Appeals held that a newspaper violated § 3604(c) by printing an advertisement for an apartment in a "white home." *Id.* at 209. The *Hunter* Court determined that the broad language of § 3604(c) extended liability beyond landlords to the newspapers and other media that carried the discriminatory advertisement. *Id.* at 214. ("In the context of classified real estate advertising, landlords and brokers 'cause' advertisements to be printed or published and generally newspapers 'print' and 'publish' them. Since each phrase in a statute must, if possible, be given effect both landlords and newspapers are within the section's reach")

In *Ragin v. New York Times Co.*, 923 F.2d 995 (2d Cir.1991), the Second Circuit extended liability for discriminatory advertising beyond the actual words of an advertisement to racial preferences based on role model advertising. Plaintiffs in *Ragin* alleged that the Sunday *New York Times* had a two decade history of printing housing advertisements which contained almost exclusively white human models, except when portraying persons looking for housing in minority neighborhoods or service employees. *See id.* at 998. The Second Circuit Court of Appeals concluded that the use of models in this way could constitute a racial preference in violation of § 3604(c) because it could discourage non-whites from seeking housing. *See id.* at 1000. As with *Hunter*, the Second Circuit in *Ragin* concluded that liability under § 3604(c) extended to newspapers publishing and printing the offending advertisements. *Id.* at 1002-03.

Discriminatory notices, statements and advertisements in a wide variety of mediums of expression have been held to violate § 3604(c). S*ee, e.g.*, *Hunter*, 459 F.2d at 210 (holding that discriminatory advertisements contained in newspapers violate § 3604(c)); *Jancik v. Dept of Hous. & Urban Dev*., 44 F.3d 353 (7th Cir. 1995)(holding that oral statements violate § 3604(c));

8

*United States v. Space Hunters, Inc.*, 429 F.3d 416, 419 (2d Cir. 2005) (holding that discriminatory preferences communicated through a telecommunication device for the deaf, or TDD, violated the FHA); *Wheatley Heights Neighborhood Coalition v. Jenna Resales Co.*, 447 F.Supp. 838, 842 (E.D. N.Y. 1978) (holding that a notice on a multiple listing service "undoubtedly falls within the statute's coverage"); *United States v. Plaza Mobile Estates*, 273 F.Supp.2d 1084, 1091 (C.D. Cal. 2003) (granting summary judgment for plaintiffs against owner of mobile home parks because preamble to park rules constituted illegal steering in violation of § 3604(c)); *Fair Hous. Cong. v. Weber*, 993 F.Supp. 1286 (1997) (C.D. Cal. 1997) (finding § 3604(c) violation in the pool rules of an apartment complex).[2]

There is nothing remarkable about the imposition of liability under § 3604(c) upon newspapers or other publishers or printers of discriminatory statements. Internet sites such as craigslist, similar to newspapers, "print" or "publish" discriminatory advertisements that are caused to be printed or published by housing providers. Discriminatory advertisements or statements contained on the Internet, however, have a far greater impact. In 2005, nine million people saw craigslist. Maria Aspan, *Great for craigslist but Not for Newspapers,* N.Y. Times, Nov. 28, 2005, at C5; attached as Ex. 2. There were up to 335,126 listings for real estate on craigslist alone in March 2006. *See* James R. Hagerty & Kevin J. Delaney, *Google, craigslist Expand into Real Estate*, Wall St. J., Apr. 6, 2006, at D1. (Ex. 1.) Google, which is also expected to enter the market of real estate listings, has 89 million visitors. *See* James R. Hagerty & Kevin J. Delaney, *Google, craigslist Expand into Real Estate*, Wall St. J., Apr. 6, 2006, at D1. (Ex. 1.) The average daily *Chicago Tribune* readership, by contrast, is about 1,858,767 people, Chicago Tribune, at: http://classified.tribune.com/ctadvertiserwebsite/ circulation.htm.

Online advertisement is increasing rapidly. Users of online classified advertising services increased 80% in 2005. Maria Aspan, *Great for craigslist but Not for Newspapers*, N.Y Times, Nov. 28, 2005, at C5. (Ex. 2.) In fact, online advertising is supplanting advertisements that used to be placed in newspaper classifieds. One analysis demonstrated that in cities where craigslist is established--the example considered was San Francisco--newspapers lost more than $50 million in classified revenue due to what is being called "the craigslist phenomena." Adam Lashinsky,

---

[2]    The United States Department of Justice has successfully obtained a consent decree in an action against a website for violations of § 3604(c), at  http://www.usdoj.gov/crt/housing/documents/ spydersettle.htm.

*Wanted: Some Hope for Newspapers*, Dec 2, 2005, *available at*
http://money.cnn.com/2005/12/02/technology /craigslist_fortune_121205/index.htm.

As greater numbers of housing opportunities are posted on Internet sites instead of in newspapers, the courts must apply § 3604(c) in a way to effectuate the FHA's clearly stated purposes of expanding housing choice and eliminating residential segregation. To immunize craigslist and other Internet sites from § 3604(c) liability would be to allow what will very soon be the most common sources of housing advertisements to print and publish discriminatory advertisements with impunity. Furthermore, immunizing websites from § 3604(c) application would have the anomalous result of newspapers like the *Chicago Tribune* being held liable for FHA violations for the very same advertisements that their web-based counterparts like chicagotribune.com can print with impunity.

4.  *Section 3604(c) Must be Harmonized with § 230 because § 3604(c) Cannot Be Impliedly Repealed.*

Section 230(c)(1) provides that:

> No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

47 U.S.C. 230(c)(1).

Immunization under § 230(c)(1) for violations of the FHA is only plausible if the CDA impliedly repeals § 3604(c). Courts can find an implied repeal "where provisions in two statutes are in 'irreconcilable conflict,' or where the latter Act covers the whole subject of the earlier one and 'is clearly intended as a substitute.'" *Branch v. Smith*, 538 U.S. 254, 273 (2003) (*citing Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936)). The statutes at issue here are neither irreconcilable nor substitutes. The FHA and the CDA are not substitutes for each other. Each act addresses entirely different problems. The FHA was designed to address the particular problem of discrimination in housing. The CDA, on the other hard, was drafted to address the general problem of "offensive or obscene material" on the Internet. *Carafano v. Metrosplash.com. Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003).

Nor are § 230(c)(1) and § 3604(c) irreconcilable, and plainly can be harmonized. First, the language of the CDA indicates that it was designed to protect Internet service providers from liability, not for posting offensive material, but rather for taking steps to block and screen such postings. Section 230(c)(1), part of the Communications Decency Act, bears the title "Protection

for 'Good Samaritan' blocking and screening of offensive material." The titles of legislative enactments are an indication of legislative intent. *First Bank & Trust Co. of Princeton Ky. v. Feuquay*, 405 F.2d 990, 993 (6th Cir. 1969). This title is strong evidence that the section reflects Congressional intent to protect those entities that make sufficient efforts to block or screen offensive material.[3]

Second, the CDA by its express terms only preempts inconsistent state law. See *Doe v. GTE Corp.*, 347 F.3d 655, 660 (7th Cir. 2003). Section 230(e)(3) provides that "[n]othing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(1). Here, the FHA is a federal law and there is nothing inconsistent between the respective goals of the FHA and the CDA.

Third, craigslist can still be held liable under § 3604(c) as a printer of discriminatory advertisements, even if, *arguendo*, §230(c)(1) immunizes it for liability as a publisher. Section 3604(c) makes it unlawful to "make, print or publish" discriminatory notices, statements or advertisements. 42 U.S.C. § 3604(c). The definition of the verb "print" from Merriam-Webster includes "to display on a surface (as a computer screen) for viewing." Because craigslist "prints" discriminatory preferences in addition to publishing them, it is liable under § 3604(c), even if the CDA were to provide immunity to craigslist for publishing the advertisements.

Harmonizing the FHA and the CDA is consistent with the language of § 3604(c) and jurisprudence of the FHA and best serves the congressional intent and purposes of the FHA described above. Providing an Internet site such as Craigslist with immunity from liability under § 3604(c), particularly at a time when increasing numbers of housing opportunities are advertised through the Internet, would seriously undermine an essential tool in expanding housing choice and integrating this nation's neighborhoods. Given § 3604(c)'s vital role in furthering the public policy goals of the FHA, it is particularly important that this Court not take the draconian step of impliedly repealing an important civil rights statute based on a provision of the CDA that simply does not speak to the issues.

---

[3] If newspapers can screen for discriminatory advertisements, there is no reason that reasonable steps cannot be taken by Internet sites to do the same, particularly in view of the expertise they surely have in this area. The issue of what type of screening of discriminatory ads by Internet companies is adequate to provide the protection of § 230(c)(1) is one to be determined during trial of this case.

*CONCLUSION*

For these reasons, the Court should deny defendant craigslist's motion for judgment on the pleadings.

Dated:  May 22, 2006

 Respectfully submitted,


JOHN P. RELMAN                        JOSEPH D. RICH
D. SCOTT CHANG                        Lawyers' Committee for
MYRNA PEREZ                           Civil Rights under Law
Relman & Associates                   1401 New York Avenue, N.W.
1225 19th Street, N.W.                Suite 400
Suite 600                             Washington, D.C. 20005
Washington, D.C. 20036-1738

# EXHIBIT 1

 **ProQuest**                          « Back to Document View

Databases selected: ProQuest Newspapers

## THE WALL STREET JOURNAL.

## Google, Craigslist Expand Into Real Estate; With Listings From Owners As Well as Agents, Sites May Weaken Realtors' Hold

*James R. Hagerty and Kevin J. Delaney.* **Wall Street Journal.** (Eastern edition). New York, N.Y.: Apr 6, 2006. pg. D.1

| | |
|---|---|
| Subjects: | Web sites, Classified advertising, Search engines, Housing |
| Classification Codes | 9190, 8360, 8331 |
| Companies: | Craigslist Inc (NAICS: 516110 ) , Google Inc (NAICS: 518112 ) |
| Author(s): | James R. Hagerty and Kevin J. Delaney |
| Document types: | News |
| Publication title: | Wall Street Journal. (Eastern edition). New York, N.Y.: Apr 6, 2006. pg. D.1 |
| Source type: | Newspaper |
| ISSN/ISBN: | 00999660 |
| ProQuest document ID: | 1016352041 |
| Text Word Count | 1148 |
| Document URL: | http://0-proquest.umi.com.gull.georgetown.edu:80/pqdweb?did=1016352041&sid=8&Fmt=3&cl ientId=5604&RQT=309&VName=PQD |

**Abstract** (Document Summary)

The Web-site companies say they don't aim to revolutionize real-estate brokerage and indeed are working to cooperate with brokers in many cases. But the growth of the sites may embolden more consumers to try selling their homes themselves and, when they do use agents, to reduce their reliance on them. Abdullah Yavas, a real-estate professor at Pennsylvania State University, says these sites may encourage an "unbundling" of agents' services, with consumers paying for only the services they want, rather than a whole package. For instance, a consumer might list a home on Craigslist and arrange showings, but still hire an agent -- for a lower commission -- to help with negotiations or guide the paper work.

Craigslist's chief executive, Jim Buckmaster, sees a move toward even more public access to information about homes for sale. The information "isn't something that should be controlled or owned by brokers," Mr. Buckmaster says. "It's going to eventually happen" that all the brokers' listings become publicly available. "You can mark that down as done. It's just a matter of when."

Google in November began allowing consumers and businesses to directly submit content such as real-estate listings for inclusion in some Google search results through a service called Base. Google previously included real-estate listings from sites it came across, but they weren't always up-to-date and couldn't easily be sorted by price and other attributes. In March, Google began on a test basis letting consumers who were searching terms such as "Los Angeles real estate" narrow their results by choosing various categories -- saying whether they want to rent or buy, for example -- and letting them see real-estate listings plotted on a map.

**Full Text** (1148 words)

*Copyright (c) 2006, Dow Jones & Company Inc. Reproduced with permission of copyright owner. Further reproduction or distribution is prohibited without permission.*

CRAIGSLIST.COM AND GOOGLE.COM, two Web sites that have fundamentally altered the way consumers buy a broad range of products, are emerging as places to shop for residential real estate, a development that in the long term could weaken Realtors' hold on home selling.

Listings of real estate for sale on Craigslist, a popular Web site featuring free classified ads, rose to 335,126 in March, more than triple the level of a year earlier. Google Inc., meanwhile, is testing a tool to help users sort through listings of homes for sale. Several more specialized sites launched in the past year -- including Trulia.com, Oodle.com and Propsmart.com — offer free access to substantial numbers of listings.

While their real-estate ventures are still relatively small, sites like Google and Craigslist have begun reshaping the advertising world as they offer a potent alternative to ad spending on traditional media such as newspapers and TV. Craigslist in particular has become a popular place to post classified listings for rental apartments, child care, jobs, furniture and personals. With household brand names and huge numbers of users -- Google had 89 million visitors in February, according to research firm NetRatings Inc. -- Google and

Craigslist have the potential to draw large numbers of home-sale listings.

The proliferation of real-estate sites comes as brokers are under pressure from several directions. As home sales slow, an increasing number of discount brokers are vying for customers. In addition, the U.S. Justice Department and the Federal Trade Commission are investigating industry practices that they say deter competition.

Commissions on home sales have declined slightly over the past decade and now average around 5.1%, according to estimates from Real Trends, an industry publication.

The Web-site companies say they don't aim to revolutionize real-estate brokerage and indeed are working to cooperate with brokers in many cases. But the growth of the sites may embolden more consumers to try selling their homes themselves and, when they do use agents, to reduce their reliance on them. Abdullah Yavas, a real-estate professor at Pennsylvania State University, says these sites may encourage an "unbundling" of agents' services, with consumers paying for only the services they want, rather than a whole package. For instance, a consumer might list a home on Craigslist and arrange showings, but still hire an agent -- for a lower commission -- to help with negotiations or guide the paper work.

Craigslist's chief executive, Jim Buckmaster, sees a move toward even more public access to information about homes for sale. The information "isn't something that should be controlled or owned by brokers," Mr. Buckmaster says. "It's going to eventually happen" that all the brokers' listings become publicly available. "You can mark that down as done. It's just a matter of when."

Unlike buying books or airplane tickets, real-estate transactions are complicated, so most people still want agents' help to complete the process of buying or selling homes. For buyers, the new home-shopping sites promise to further erode the information advantage enjoyed by real-estate agents over consumers. Most of the new sites offer listings of homes being sold directly by owners, as well as those being sold through agents. (Trulia.com includes only agent listings.) That contrasts with the policy of Realtor.com, the popular real-estate Web site owned by the National Association of Realtors. Realtor.com excludes homes for sale by owners.

"As a buyer, you want to see everything that's available," not just the homes represented by agents, says Ron Hornbaker, co-founder and president of Propsmart Inc., Kansas City, Mo., which owns Propsmart.com.

Shoppers can't rely on agents to tell them about for-sale-by-owner offerings, because agents often don't earn commissions for introducing buyers to these properties and find such transactions more difficult to complete. Agents also may fail to tell potential buyers about homes being sold through discount brokers.

There are already a host of specialized for-sale-by-owner Web sites, but none of them can promise one-stop shopping. ForSaleByOwner.com, one of the biggest such sites, estimates that it has 10% of all owner listings. While Craigslist and Google won't be comprehensive either, their sheer size will likely attract more listings. Another attraction for sellers: They can post information on the new sites free, while some specialized FSBO sites charge fees.

Realtor.com still has a formidable advantage, with about three million listings -- around 10 times the number on Craigslist. Realtor.com gets listings from nearly all multiple-listing services -- the local firms that compile listings from brokers and are generally owned by local Realtor organizations. The National Association of Realtors says about 13% of home sales last year were FSBO and that often those were sales between people who already knew each other.

Google in November began allowing consumers and businesses to directly submit content such as real-estate listings for inclusion in some Google search results through a service called Base. Google previously included real-estate listings from sites it came across, but they weren't always up-to-date and couldn't easily be sorted by price and other attributes. In March, Google began on a test basis letting consumers who were searching terms such as "Los Angeles real estate" narrow their results by choosing various categories -- saying whether they want to rent or buy, for example -- and letting them see real-estate listings plotted on a map.

To keep up with the competition, a number of real-estate brokers are improving their own sites. Real Living Inc., a big regional broker based in Columbus, Ohio, recently upgraded its site to provide email alerts to buyers when there is new information about some properties and to let sellers see how many people have viewed their homes and what comments they have made.

Most sellers still want their homes listed on the local services operated by Realtors. Perry Ahmed, an investor with several properties for sale in the Washington, D.C., area, lists them through real-estate agents on a multiple-listing service but also puts them on Google and Craigslist. He has worked out a deal with his agent that will ensure that he pays lower fees if he finds a buyer without the agent's help.

Many of the ads on both Google and Craigslist are for homes whose owners are represented by real-estate agents. But some are from people like Leigh Chodos, a marketing consultant in Brookline, Mass., who isn't using an agent in his efforts to sell a condo. "I'd rather save myself the 6% commission," Mr. Chodos says.

---

Mylene Mangalindan contributed to this article.

---

Home Shopping

-- Craigslist.com's listings of real estate for sale rose to 335,126 in
March, more than triple the year-earlier level.

-- New sites offering info on homes for sale include Oodle.com, with 1.5
million home listings, and Propsmart.com, with 948,000 listings.

-- Realtor.com, owned by the National Association of Realtors, has about
three million listings.

-- Google is testing a tool to help users sort through listings of homes
for sale.

Copyright © 2006 ProQuest Information and Learning Company. All rights reserved. Terms and Conditions

Text-only interface



# EXHIBIT 2

**ProQuest**                                    « Back to Document View

Databases selected:  ProQuest Newspapers

# The New York Times

## Great for Craigslist but Not for Newspapers

*Maria Aspan.* **New York Times**. (Late Edition (East Coast)). New York, N.Y.: Nov 28, 2005. pg. C.5

| | |
|---|---|
| Subjects: | Online advertising,  Classified advertising |
| Companies: | Craigslist Inc (NAICS: 516110 ) |
| Author(s): | Maria Aspan |
| Document types: | News |
| Column Name: | *Drilling Down* |
| Section: | *C* |
| Publication title: | New York Times. (Late Edition (East Coast)). New York, N.Y.: Nov 28, 2005.  pg. C.5 |
| Source type: | Newspaper |
| ISSN/ISBN: | 03624331 |
| ProQuest document ID: | 932274471 |
| Text Word Count | 195 |
| Document URL: | http://0-proquest.umi.com.gull.georgetown.edu:80/pqdweb?did=932274471&sid=7&Fmt=3&clientId=5604&RQT=309&VName=PQD |

**Abstract** (Document Summary)

In 2005, almost nine million of those visitors went to Craigslist.org, a 165 percent increase from 3.4 million last year. "It was a huge increase on top of a pretty large base to begin with," said Lee Rainie, director of the Pew project. Mr.

**Full Text** (195  words)

*Copyright New York Times Company Nov 28, 2005*

The number of users of online classified advertising services increased 80 percent this year, according to a report released yesterday by the Pew Internet and American Life Project based on data gathered by comScore Media Metrix.

In 2005, almost nine million of those visitors went to Craigslist.org, a 165 percent increase from 3.4 million last year. "It was a huge increase on top of a pretty large base to begin with," said Lee Rainie, director of the Pew project. Mr. Rainie said that Craigslist, which offers free listings for everything from apartments to furniture and personal ads, attracted more patrons by opening 15 city- or region-specific sites this year.

The report is bad news for classified advertising sources like newspapers, which have historically dominated the market. Mr. Rainie cited Craigslist's relief services after Hurricane Katrina as an example of its ability to meet the needs of a large, diverse consumer group. "One of the most appealing things to users of Craigslist is how adaptable it is," he said. MARIA ASPAN

[Illustration]
Photo

[Chart]
14,626,000
Number of unique visitors to classified advertising Web sites, September 2004.

26,349,000
Number of unique visitors to classified advertising Web sites, September 2005.

Copyright © 2006 ProQuest Information and Learning Company. All rights reserved. Terms and Conditions

Text-only interface

