IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, INC. | ) | |
| Plaintiff | ) | Judge Amy J. St. Eve |
| v. | ) | Magistrate Judge Jeffrey Cole |
| CRAIGSLIST, INC. | ) | Case No. 06 C 0657 |
| Defendant. | ) | |

**BRIEF OF AMICI AMAZON.COM, INC., AOL LLC, EBAY INC., GOOGLE INC., YAHOO! INC., ELECTRONIC FRONTIER FOUNDATION, INTERNET COMMERCE COALITION, NETCHOICE, NETCOALITION, AND UNITED STATES INTERNET SERVICE PROVIDER ASSOCIATION**
**IN SUPPORT OF CRAIGSLIST'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Dockets.Justia.com

The Amici who submit this brief are at the forefront of the ongoing communications revolution that has been spawned by the advent and explosive growth of new electronic media and technologies that utilize the Internet. They comprise many of the country's leading online and Internet companies and provide users around the world with an ever-expanding array of interactive services. Unlike predecessor media, these new media have, as their defining quality, the phenomenal capacity for almost anyone with a computer, from individuals to large businesses and other organizations, to disseminate virtually instantaneously vast quantities of diverse content that is then available to people around the globe.

As such, the Amici have a vital stake in the proper resolution of the issue presented by craigslist's motion: whether providers of interactive computer services may be held liable for allegedly harmful content that is made available through such a service but that originated with someone else. As craigslist explained in its opening brief, courts throughout the country have correctly concluded that 47 U.S.C. § 230(c)(1) ("Section 230") provides interactive computer service providers such as Amici with broad immunity from claims based on third-party content. Each of these courts has reached this conclusion based on the plain language of the statute, as well as Congress's clear intent — expressed in the statutory preamble as well as in the legislative history. Indeed, Congress has explicitly endorsed the settled view of the statute — and even extended those same protections to a new class of entities.

The plaintiff and the National Fair Housing Alliance ("NFHA") propose that this Court depart radically from this settled interpretation of Section 230 and consign Section 230(c)(1) to mere "definitional" status. But their proposed interpretation, based on inconclusive *dicta* in *Doe v. GTE Corp.*, 347 F.3d 655 (7th Cir. 2003) (Easterbrook, J.), is contrary to the plain meaning of the statute and indeed would render it incoherent. Moreover, the plaintiff's interpretation would frustrate Congress's two key goals in enacting Section 230 and in the process impair the development and discourage the provision of a wide range of innovative services.

One key purpose of Section 230 was to promote the continued development of interactive computer services. Congress recognized that such services were revolutionizing the way that people communicate and gather information because — unlike predecessor media such as

newspapers — these services carry a vast amount of information that originates with subscribers and other third parties and is disseminated nearly instantaneously. In this context, Congress determined that the risk of liability for third-party communications would significantly diminish the incentives and ability of providers to offer such robust services. Congress thus decided that, in order to promote ongoing development of online services, it should, subject to a handful of express exceptions, eliminate the risk that service providers would be held liable for unlawful communications made by others, leaving such risk on the originators of such communications.

Second, Congress sought to eliminate the disincentives to *self*-regulation that existed under traditional legal principles. Specifically, before Section 230, service providers faced disincentives to engage in screening, monitoring, or other self-policing activities because such activities could result in their being charged with actual or constructive knowledge of allegedly unlawful content — the threshold predicate for liability for disseminators of third-party communications under the First Amendment and common law. By immunizing service providers from most claims based on third-party content, Congress eliminated the risk that they would be held liable as a result of their self-regulatory efforts and freed them to experiment with new forms of self-regulation — forms directed by the market and technology and not by the government or judicial fiat.

The industry's experience in the ten years since Congress passed Section 230 has confirmed Congress's foresight in this area. In the wake of virtually unanimous case law affirming that Section 230(c)(1) grants service providers broad immunity for third-party content, such services have flourished, with innovative offerings rapidly being made available to consumers. At the same time, as Amici's own services exemplify, service providers have engaged in a variety of voluntary self-regulatory measures, often developing new technological means for reducing the availability of harmful content while relying on the assurance that such activity would not cause them to incur additional liability. And persons who nevertheless suffer harm still have available to them the full range of legal remedies against the actual wrongdoers

— those who originated the harmful content.[1/] The plaintiff now invites this Court to drastically change this regime based on a jumbled reading of Section 230 entirely contrary to the settled reading of numerous other courts. This Court should reject the plaintiff's invitation.

## I. THE PLAINTIFF'S INCOHERENT INTERPRETATION OF SECTION 230(C) CANNOT BE SQUARED WITH THE PLAIN LANGUAGE OF THE STATUTE.

The plaintiff's unprecedented departure from the settled case law is contrary to the plain language of Section 230. Section 230(c)(1) contains a plain prohibition: A "provider or user of an interactive computer service" may not be "treat[ed] as the publisher or speaker of" third-party content. As the courts have all correctly concluded, this language bars any claim based on the dissemination of third-party content that would "treat" a service provider as a "publisher or speaker" of that content. (*See* craigslist Br. at 5-7, 10-13 (citing cases).) Section 230(c)(2) provides a different, additional protection. That section states that a "provider or user of an interactive computer service" may not "be held liable on account of" "any action voluntarily taken in good faith to restrict access to or availability of" objectionable material, even if that material is "constitutionally protected." 47 U.S.C. § 230(c)(2). Section 230(c)(2) thus ensures

---

[1/] Although the plaintiff suggests that recourse against the originator of content may not be available because the originator may have posted it without disclosing his or her real name (*see* Opp'n at 4), subpoenas and other legal process provide a mechanism for potential plaintiffs to identify the actual speaker. For example, courts have developed processes and standards for persons injured by unlawful anonymous online content to commence a suit against a "John Doe" defendant and then to issue subpoenas to service providers for information that will identify the source of the content. *See, e.g.*, *Doe v. Cahill*, 884 A.2d 451 (Del. 2005); *Dendrite v. Doe*, 775 A.2d 756 (N.J. App. Div. 2001). Many of the Amici represented here regularly respond to such subpoenas. Moreover, in the context of housing postings, anonymity is especially unlikely to be an issue, because housing ads must provide a means for readers to get in touch with the poster concerning the housing opportunity.

that good faith actions to block or screen objectionable content cannot give rise to liability and, in particular, that service providers cannot be sued by the originators of content that is removed.

Contrary to this straightforward reading of the statute, the plaintiff contends that Section 230(c)(1) and Section 230(c)(2) do not provide two distinct forms of immunity. Instead, the plaintiff claims that only Section 230(c)(2) provides any immunity, while Section 230(c)(1) only defines the class of persons who are eligible for the protections of Section 230(c)(2). (Opp'n at 8.) In particular, the plaintiff asserts that a person cannot be a "provider or user" entitled to the protection of Section 230(c)(2) if that person is also deemed to be a "publisher or speaker" of the content at issue. (*Id.* at 10.)

This fanciful and contorted interpretation, which the plaintiff ironically describes as "straightforward" (*id.* at 8), has no relationship to the actual language of either Section 230(c)(1) or Section 230(c)(2). To begin with, Section 230(c)(1) is not phrased as a definitional provision — it is a prohibition on how providers or users of interactive computer services may be "treat[ed]" by the law. Moreover, Section 230 has its own *separate* set of "definitions" in a different section of the statute. *See* 47 U.S.C. § 230(f). More fundamentally, the distinct immunity set forth in Section 230(c)(2) on its face does not depend in any way on whether the defendant is a "publisher or speaker" of any of the content at issue and indeed does not even use those terms. Instead, Section 230(c)(2) provides without qualification that a "provider or user of an interactive computer service" cannot be held liable for good faith actions to restrict access to objectionable material. Thus, under the plain terms of the statute, Section 230(c)(1) cannot play a definitional role, and plaintiff's proposed interpretation would render that provision a nullity.[2/]

---

[2/] Indeed, that is true from another perspective as well. Section 230(c)(1) states that a service provider may not be treated as the publisher or speaker of *another* person's content; conversely, it may be treated as the publisher or speaker of its own content. If, as the plaintiff asserts, the sole function of Section 230(c)(1) is to make Section 230(c)(2) immunity unavailable when the provider is a publisher or speaker — that is, when its *own* content is at issue — then

The plaintiff's interpretation depends on an equally incoherent understanding of the operation of Section 230(c)(2). Although the plaintiff's argument is not entirely clear, it appears to assume that Section 230(c)(2) protects service providers from liability for displaying or disseminating content *if* they engage in some form of "good faith" blocking and screening. (Opp'n at 6.) But the plaintiff points to no language in Section 230(c)(2) that purports to immunize service providers for the *display* of information. To the contrary, Section 230(c)(2) prevents a service provider from being liable because of its efforts to *restrict* access. Conversely, Section 230(c)(1) does apply to the display of third-party content, and, as courts have recognized, Section 230(c)(1) immunity is not tied to any requirement that the service providers take affirmative steps to restrict access to content. *See, e.g.*, *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1124 (9th Cir. 2003) (service provider entitled to "full immunity" so long as a "third party willingly provide[d] the essential published content"); *Zeran v. America Online, Inc.*, 129 F.3d 327, 328 (4th Cir. 1997) (Wilkinson, C.J.) ("Section 230 . . . plainly immunizes computer service providers like AOL from liability for information that originates with third parties."); *Blumenthal v. Drudge*, 992 F. Supp. 44, 52 (D.D.C. 1998) ("Congress has conferred immunity from tort liability as an incentive to Internet service providers to self-police the Internet for obscenity and other offensive material, even where the self-policing is unsuccessful or not even attempted.").

Thus, as the decisions of numerous courts confirm, the plaintiff's proposed interpretation of Section 230 is wholly contrary to the plain text of the statute.

---

Section 230(c)(1) would have no practical effect: Section 230(c)(2) immunizes a service provider from liability to a person whose content has been removed or restricted, and obviously there is no risk of a service provider suing *itself* for having removed or restricted its *own content*.

## II. THE PLAINTIFF'S INTERPRETATION OF SECTION 230 WOULD FUNDAMENTALLY UNDERMINE CONGRESS'S KEY GOALS.

As courts have recognized, and as the language of the statute and the legislative history make clear, Congress passed Section 230 with two key policy goals in mind. First, Congress intended to promote the continued development of vibrant and diverse online media and services. Second, Congress sought to provide service providers with the flexibility to engage in voluntary *self-regulation* — that is, to police their own systems for objectionable content. The plaintiff's unprecedented interpretation of Section 230 would undermine both of these core goals.

### A. Section 230(c)(1) Immunity Frees Service Providers To Develop and Deploy New and Diverse Services and Encourages Vibrant Online Speech.

Although the plaintiff attempts to brush it aside, one of Congress's unequivocal goals in enacting Section 230 was to encourage the development of new and diverse interactive computer services. The preamble to Section 230 could not be clearer: Declaring that "interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity," and determining that these services have "flourished, to the benefit of all Americans, with a minimum of government regulation," 47 U.S.C. § 230(a)(3)-(4), Congress concluded that it is "the *policy* of the United States . . . to preserve the *vibrant and competitive* free market that presently exists for the Internet and other interactive computer services, *unfettered by Federal or State regulation*." *Id.* § 230(b)(2) (emphasis added). As the Ninth Circuit explained, Congress thus clearly enacted Section 230 "to encourage the *unfettered and unregulated* development of free speech on the Internet." *Batzel v. Smith*, 333 F.3d 1018, 1027-28 (9th Cir. 2003) ("there is little doubt that [Section 230] sought to further First Amendment and e-commerce interests on the Internet").

Congress was concerned that allowing online intermediaries to be held liable for their users' content would endanger this emerging media. As the Fourth Circuit said in *Zeran*,

> The imposition of tort liability on service providers for the communications of others represented, for Congress, simply another form of intrusive government regulation of speech. Section 230 was enacted, in part, to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum.

129 F.3d at 330; *see also id.* (Congress enacted Section 230 to promote "freedom of speech in the new and burgeoning Internet medium" by eliminating the "threat [of] tort-based lawsuits" against interactive services for injury caused by "the communications of others."); *Batzel*, 333 F.3d at 1028 (Section 230 was intended "to prevent lawsuits from shutting down websites and other services on the Internet").

Questioning this policy goal, the plaintiff and the NFHA assert that there is no difference between traditional and new media in terms of the ability to screen harmful information, and that online media should be subject to the same burdens as traditional media. (Opp'n at 4 & n.2; NFHA Br. at 11 n.3.) But this is simply contrary to the facts of which Congress was keenly aware. Unlike many interactive computer services, traditional media such as newspapers can and generally do screen the content of advertising and other third-party content that they publish. For example, in *Ragin v. New York Times Company*, 923 F.2d 995 (2d Cir. 1991), the New York Times was held potentially liable under the Fair Housing Act for running allegedly discriminatory advertisements in part because of the "extensive monitoring" of advertisements that was "routinely performed" by the New York Times. *Id.* at 1004. Congress recognized that interactive computer services are fundamentally different from traditional media in this crucial respect. Rather than operating as a centralized "publisher," these services make it possible for millions of users to publish material online directly — and often instantaneously.

Congress passed Section 230 to ensure that the law recognized this key difference, an intent reflected in the floor debate on the statute as well as its statutory preamble. For example,

in urging passage of Section 230 Representative Goodlatte described a "very serious problem" for the companies that were making the new communications revolution a possibility:

> There is no way that any of those entities, like Prodigy, *can take the responsibility to edit out information* that is going to be coming in to them from all manner of sources onto their bulletin board. We are talking about something that is *far larger than our daily newspaper*. We are talking about something that is going to be thousands of pages of information every day, *and to have that imposition imposed on them is wrong*.

141 Cong. Rec. 22,046 (1995) (Rep. Goodlatte) (emphasis added). As Rep. Goodlatte explained, Section 230 was intended to "*cure that problem*" — by eliminating the risk that service providers would have that burden imposed on them. *Id.* (emphasis added). The Fourth Circuit thus correctly explained the federal policy that Section 230 represents:

> Congress made a policy choice . . . not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages.
>
> Congress' purpose in providing the § 230 immunity was thus evident. Interactive computer services have millions of users. The amount of information communicated via interactive computer services is therefore staggering. The specter of tort liability in an area of such prolific speech would have an obvious chilling effect.

*Zeran*, 129 F.3d at 330-31 (citation omitted).

The sheer volume of third-party content carried by the Amici (or those that they represent) illustrates the challenge that online intermediaries would face if they were subject to liability for third-party content. For example, Amazon.com's site makes available millions of individual reviews posted by third-party users. These user reviews — the type of content for which Amazon.com was held immune from liability in *Schneider v. Amazon.com*, 31 P.3d 37, 43 (Wash. Ct. App. 2001) — enable other purchasers to gather valuable feedback about the products offered for sale. AOL, the provider of the world's largest online service and the defendant in

many of the leading cases applying Section 230 immunity, disseminates an enormous range of third-party content, including message boards (at issue in *Zeran*, 129 F.3d 327), chat rooms (at issue in *Doe v. America Online, Inc.*, 783 So. 2d 1010 (Fla. 2001), *Green v. America Online, Inc.*, 318 F.3d 465, 471 (3d Cir. 2003), and *Noah v. AOL Time Warner Inc.*, 261 F. Supp. 2d 532 (E.D. Va. 2003)), and feature publications (at issue in *Blumenthal*, 992 F. Supp. at 49). eBay has almost two-hundred-million members, and each day, about five million new items for sale by third parties are added to eBay's auction website. eBay also invites buyers and sellers to rate and comment on their dealings with other users, and the comments and composite ratings are displayed in eBay's Feedback Forum (the venue of the content for which eBay was held immune from liability in *Gentry v. eBay Inc.*, 121 Cal. Rptr. 2d 703, 714 (Ct. App. 2002)).

Google's Web page search service, used by tens of millions of users every day, is based on an index of more than eight billion third-party Web pages. And the Google Base service allows users to post virtually any kind of content online — including a broad range of products or services, allowing Google to function as an easily-searchable classifieds page. Yahoo!, which has over four hundred million unique users each month and has 2.4 billion page views per day, hosts millions of personal Web sites (including the profile service for which Yahoo! was held immune in *Barnes v. Yahoo!*, No. Civ. 05-926-AA, 2005 WL 3005602 (D. Or. Nov. 8, 2005)), provides forums for all manner of organizations through Yahoo! Groups, offers message boards covering more than 80,000 topics and including more than fifteen-million messages at any given time, and makes available numerous other types of third-party content, ranging from user reviews for shopping and travel services to listings on its Web search service.

Each of these services has revolutionized the way that people buy and sell goods, make friends, learn facts and opinions, obtain and give feedback, locate services, find housing, or otherwise make connections that could not be made using traditional media. Section 230 plays a crucial role in keeping these services viable: Given the "staggering" volume of third-party content that they carry, if service providers were "[f]aced with potential liability" for each piece

of such content carried over their services, they likely would otherwise be forced to restrict or abandon altogether many of the features that enable the dissemination of third-party content in the first place. *See Zeran*, 129 F.3d at 331; *Batzel,* 333 F.3d at 1027 ("[m]aking interactive computer services and their users liable for the speech of third parties *would severely restrict* the information available on the Internet").

The plaintiff's reading of Section 230 ignores this goal. Under its reading, service providers would be potentially liable for all of their users' and other third parties' communications — not only in the specific area of housing advertisements, but for every form of potentially regulated content and, indeed, for all content as to which liability might be imposed. Indeed, under the theory advanced by the plaintiff, service providers would be forced to familiarize themselves with every potentially applicable federal or state regulation governing the content of online communications, and then institute some form of screening mechanism that would, somehow, block all communications that may run afoul of such regulations. Moreover, under the plaintiff's interpretation, a service provider would have no way to be certain that whatever screening mechanism it adopted was sufficient to qualify it for the immunity provision. Indeed, the NFHA suggests that the adequacy of any such mechanism would have to be established at a "trial." (NFHA Br. at 11 n.3.) But the mere prospect of having to engage in such litigation and the concomitant legal risk would itself create a significant deterrent to the development of innovative services — precisely the result Congress sought to avoid.

### B. Section 230(c)(1) Immunity Is Intended to Encourage Voluntary, Market-Driven Self-Regulation.

Congress was mindful that interactive computer services could be used to disseminate harmful, unlawful, or otherwise objectionable content. Nonetheless, Congress specifically and deliberately decided that the dissemination of such content should not be controlled by imposing liability on the intermediaries. With the exception of a handful of specific exemptions, none of

which apply here, Congress deliberately decided that only the actual wrongdoers — the *originators* of the content — should be subject to liability.[3/]

At the same time, Congress determined that service providers also could play a constructive role by engaging in self-regulatory efforts to restrict access to or availability of objectionable material in a manner that was appropriately tailored in light of the nature and design of their services. As Representative Cox, a sponsor of the bill, explained: "Government is going to *get out of the way* and let parents and individuals control [the Internet] rather than government doing that job for us." 141 Cong. Rec. 22,045 (1995) (emphasis added). Congress sought to achieve this goal by "encourag[ing] interactive computer services and users of such services to self-police the Internet for obscenity and other offensive material." *Batzel*, 333 F.3d at 1028. *See also Zeran*, 129 F.3d at 331 (Section 230 was intended "to encourage service providers to self-regulate the dissemination of offensive material over their services"); 141 Cong. Rec. 22,046 (Section 230 was designed to give interactive service providers "a reasonable way to . . . help them *self-regulate* themselves *without penalty of law*") (emphasis added).

---

[3/] Congress carefully carved out specific exceptions from the scope of Section 230's immunities, including exceptions for federal criminal prosecutions and intellectual property and electronic privacy claims. 47 U.S.C. § 230(e). As craigslist explained, by exempting these specific areas, Congress made clear that all other areas of the law, including other federal claims, are subject to Section 230 immunity. (craigslist Br. at 6-7.) That judgment should not be second-guessed by the courts. As the California Court of Appeal recently explained in another context involving online media, "[t]he treatment of rapidly developing new technologies profoundly affecting not only commerce but countless other aspects of individual and collective life is not a matter on which courts should lightly engraft exceptions to plain statutory language without a clear warrant to do so." *O'Grady v. Superior Court*, _ Cal. Rptr. 3d _, No. H028579, 2006 WL 1452685, at *9 (Cal. Ct. App. May 26, 2006); *see also id.* ("Few cases have provided a more appropriate occasion to apply the *maxim expressio unius exclusio alterius est*, under which the enumeration of things to which a statute applies is presumed to exclude things not mentioned.").

Congress implemented this goal by reducing the disincentives to self-regulation that existed before Section 230 was passed. Under traditional common law and First Amendment principles, a service provider could be held liable for content that it merely disseminated only if the service provider actually knew or should have known of the harmful content at issue.[4/] This legal regime perversely "reinforced service providers' incentives to . . . abstain from self-regulation," because they would have a strong incentive to avoid self-policing for fear of being held liable for anything a jury determines they should have uncovered — that is, "had reason to know" about — in the course of their efforts to monitor their services, even if they had overlooked the unlawful content.[5/] *See Zeran*, 129 F.3d at 333 ("Any efforts by a service provider to investigate and screen material posted on its service would only lead to notice of potentially defamatory material more frequently and thereby create a stronger basis for liability.").

Congress wanted to give service providers freedom to implement self-regulatory measures without fear that by doing so they would be exposing themselves to potential liability, but not to require them to do so in order to qualify for immunity. By passing Section 230, Congress freed service providers to adopt robust self-regulatory regimes, experiment with different approaches to self-regulation, implement novel technical solutions, and otherwise respond to the demands of the marketplace and the possibilities of technology.

---

4/ As a matter of the First Amendment, an entity that serves as an intermediary for large quantities of third-party content — whether it be a bookstore, a library, or the provider of an online forum — cannot be held liable for unlawful content that may be interspersed among the overall body of information being disseminated absent evidence that it knew or should have known of that content. *See, e.g.*, *Smith v. California*, 361 U.S. 147, 152-53 (1959).

5/ Indeed, as discussed above, it was precisely its active monitoring of advertisements that may have exposed the New York Times to potential liability under the FHA. *See supra* at 7-8.

Relying on Judge Easterbrook's speculative dicta, the plaintiff asserts that the established interpretation of Section 230 immunity would in fact encourage service providers "to take the do-nothing option and enjoy immunity" without engaging in any self-regulatory actions at all. (Opp'n at 9.) But that speculation is belied by reality. After years of adapting to the broad Section 230 immunity regime uniformly recognized by numerous courts throughout the country, service providers *have* adopted a wide range of voluntary, self-regulatory measures, a fact reflected in the aggressive and creative steps taken by the present Amici to self-regulate their own services in innovative, robust ways. Just by way of example:

- Amazon.com provides users with mechanisms for reporting complaints about content, including a link below each user-provided review allowing any viewer to report the review as "inappropriate." It has automated and manual processes to review complaints and removes third-party content that fall outside its guidelines.
- AOL's Terms of Service include detailed Community Guidelines setting rules and standards for member-supplied content. AOL also has a "Community Action Team" that responds to complaints, monitors message boards and chat rooms, and has authority to enforce the Terms of Service and Community Guidelines.
- eBay offers users a simple Web form that they can use to complain about all manner of third-party content on the eBay service, including inappropriate Feedback, listing violations, and problems with other sellers and buyers (including potential fraud).
- Google maintains numerous Web pages and e-mail addresses (such as groups-abuse@google.com) through which users can submit complaints and other comments concerning third-party content available through its services.
- Yahoo! offers easy access to its "customer care" page for reporting inappropriate content on the Yahoo! service, a kid-friendly service through Yahooligans, and special programs to screen specific types of content, such as certification requirements for online pharmacies that want to participate in Sponsored Search.

Indeed, it appears from craigslist's website that craigslist also has voluntarily implemented a variety of self-regulatory measures aimed at reducing the incidence of discriminatory housing postings on its service. For example, its user agreement specifically bans users from posting discriminatory housing posts, and it empowers its users to "flag" inappropriate posts, with posts that receive a critical mass of such flags being automatically removed.[6/]

These are precisely the kinds of voluntary, self-regulatory actions that Congress intended to encourage, and Section 230(c)(1) immunity is therefore having its intended effect. By contrast, under the plaintiff's proposed approach, civil litigants would be permitted to use the judicial process to impose on service providers particular forms of policing systems. Congress expressly sought to avoid such intrusive regulation of online services.

---

[6/] *See, e.g.*, craigslist Terms of Use, http://www.craigslist.org/about/terms.of.use.html; Flags and Community Moderation, http://www.craigslist.org/about/help/flags.html.

## CONCLUSION

The Amici believe that the federal Fair Housing laws *should* have force in the online world. But as with other allegedly harmful content, any imposition of liability should be focused on the actual wrongdoers — that is, the people who originate the allegedly unlawful content. Subject to very narrow exceptions, Congress concluded that courts should not entertain claims that would impose liability on an online intermediary for its users' communications. The Court should reject the plaintiff's tortured attempt to undo Congress's decision.

Respectfully submitted,

___/s/ Samuel Fifer_______________

Marc J. Zwillinger (ARDC # 6226447)
Samuel Fifer (ARDC # 0803006)
Julie Samuels (ARDC # 6287282)
SONNENSCHEIN NATH &
ROSENTHAL LLP
7800 Sears Tower
233 South Wacker Drive
Chicago, Illinois 60606

*Counsel for Amici Amazon.Com, Inc., AOL LLC, eBay Inc., Google Inc., Yahoo! Inc., Electronic Frontier Foundation, Internet Commerce Coalition, NetChoice, NetCoalition, and United States Internet Service Provider Association*

(Additional counsel listed on next page)

Of Counsel:

David A. Zapolsky
Vice President & Associate
General Counsel
Amazon.com, Inc.
1200 12 Avenue S., Suite 1200
Seattle, WA 98144

David C. Goldberg
Chief Litigation Counsel
AOL LLC
22000 AOL Way
Dulles, VA 20166

Jay Monahan
Vice President & Deputy General Counsel
Michael J. Richter
Senior Counsel, Litigation & Intellectual Property
eBay Inc.
2145 Hamilton Avenue
San Jose, CA 95125

Michael S. Kwun
Litigation Counsel
Google Inc.
1600 Amphitheatre Parkway
Mountain View, CA 94043

Elizabeth Banker
Associate General Counsel
Yahoo! Inc.
444 North Capitol Street NW
Suite 605
Washington, DC 20001

Kurt Opsahl
Staff Attorney
Electronic Frontier Foundation
454 Shotwell Street
San Francisco CA 94110-1914

James J. Halpert
DLA Piper Rudnick Gray Cary US LLP
1200 19th Street, NW
Washington, DC 20036
General Counsel, Internet Commerce Coalition

Markham Erickson
General Counsel
NetCoalition
400 North Capital Street, NW, Ste. 585
Washington, D.C. 20001

Steve DelBianco
Executive Director
NetChoice
1413 K Street, NW, 12th Floor
Washington, DC 20005

Marc J. Zwillinger
General Counsel
US Internet Service Provider Association
1330 Connecticut Ave., NW
Washington, DC 20036