**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER THE LAW, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 06 C 0657 |
| CRAIGSLIST, INC., | ) ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

AMY J. ST. EVE, District Court Judge:

Plaintiff Chicago Lawyers' Committee for Civil Rights Under Law, Inc. ("CLC") has filed suit under 42 U.S.C. §3604(c) of the Fair Housing Act ("FHA") seeking monetary, declaratory, and injunctive relief against Defendant "craigslist, Inc." ("Craigslist"). CLC alleges that such relief is warranted because Craigslist publishes notices, statements, or advertisements with respect to the sale or rental of dwellings that indicate (1) a preference, limitation, or discrimination on the basis of race, color, religion, sex, familial status, or national origin; and (2) an intention to make a preference, limitation, or discrimination on the basis of race, color, religion, sex, familial status, or national origin. Craigslist has moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) ("Rule 12(c)"), contending that Plaintiff's claim is barred based on the immunity afforded to "providers . . . of interactive computer services" ("ICSs") under 47 U.S.C. §230 ("Section 230"). For the reasons below, the Court grants Craigslist's motion.

**LEGAL STANDARD**

A motion under Rule 12(c) – a motion that a defendant may use to dismiss a complaint based on an affirmative defense, *see, e.g., McCready v. EBay, Inc.*, 453 F.3d 882, 892 n.2 (7th Cir. 2006) – is subject to the same standard as a motion to dismiss pursuant to Rule 12(b)(6). *Craigs, Inc. v. Gen. Elec. Capital Corp.*, 12 F.3d 686, 688 (7th Cir. 1993); *Thomason v. Nachtrieb*, 888 F.2d 1202, 1204 (7th Cir. 1989). Thus, a court must "view the facts in the complaint in the light most favorable to the nonmoving party," *GATX Leasing Corp. v. Nat'l Union Fire Ins. Co.*, 64 F.3d 1112, 1114 (7th Cir. 1995), and cannot grant the motion "unless it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Thomason*, 888 F.2d at 1204 (citing *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 101-02, 2 L. Ed. 2d 80 (1957)).

**BACKGROUND**

I. **The Parties**

Plaintiff CLC, a public interest consortium of forty-five law firms, is an Illinois non-profit organization with its principal place of business in Chicago, Illinois. (R. 1-1, Pl.'s Compl. at ¶5; R. 41-1, Pl.'s Motion to Supp. at ¶1.) CLC's mission is to promote and protect civil rights, particularly the civil rights of the poor, ethnic minorities, and the disadvantaged. (R. 1-1, Pl.'s Compl. at ¶5.) CLC strives to eliminate discriminatory housing practices by: (1) educating people about their rights under the fair housing and fair lending laws; (2) investigating complaints of fair housing discrimination; (3) providing referral information for non-discrimination housing matters; (4) advocating on a wide range of housing related issues, such as public housing, increased affordable housing, and fair and equal mortgage lending opportunities; and (5) providing free legal services to individuals and groups who wish to exercise their fair housing rights and secure equal housing

opportunities.  (*Id.*)

Defendant Craigslist is a Delaware corporation located in San Francisco, California that operates a website through "a small staff in a single office."  (*Id.* at ¶6; R. 15-1, Def.'s Motion at 1.) In a typical month, Craigslist posts more than 10 million items of "user-supplied information," (R. 15-1, Def.'s Motion at 1), and user postings are increasing at a rate of approximately 100% per year. (*Id.* at 1 n.1.)

In addition to the parties' submissions, the Court has granted leave to the National Fair Housing Alliance ("NFHA") to submit an *amicus* brief.  The NFHA is a non-profit corporation that represents approximately eighty five private, non-profit fair housing organizations throughout the country.  (R. 17-2; NFHA Br. at 1.)  NFHA was founded in 1988 "to lead the battle against housing discrimination and ensure equal housing opportunity for all people."  (*Id.*)  The NFHA describes its mission as promoting equal housing, lending, and insurance opportunities through outreach, policy initiatives, advocacy, and enforcement.  (*Id.*)  Relying on the FHA, the NFHA and its members have undertaken enforcement initiatives in cities and states across the country.  (*Id.*)

The Court also granted leave to file a joint *amicus* brief to ten companies and trade associations affiliated with the online and electronic communications industries (collectively, the "Service Providers").  These *amici* include:  (1) Amazon.com, Inc., an online service that, through its website, offers millions of items for sale including jewelry, apparel, accessories, books, music, and DVDs; (2) AOL LLC, the operator the AOL.com website and the largest internet service provider ("ISP") in the United States, offering service to millions of members; (3) eBay Inc.,[1] operator of a website featuring an online auction-style trading format that offers "a forum in which

---

[1]       eBay has a minority stake of approximately 25% in Craigslist.  (*Id.* at 2 n.1.)

today almost two hundred million users can sell goods directly to each other;" (4) Google Inc., an online provider that maintains the Google Web Search service, which is an index of more than eight billion Web pages from content providers around the world; (5) Yahoo! Inc., online provider that offers services, including a Web search engine and a network that hosts millions of personal websites, to more than 411 million individuals each month worldwide; (6) Electronic Frontier Foundation, a non-profit, member-supported civil liberties organization that "actively encourages and challenges industry, government, and the courts to support free expression, privacy, and openness in the information society;" (7) Internet Commerce Coalition, a coalition of ISPs, e-commerce companies, and trade associations; (8) NetChoice, a coalition of online businesses and consumers "who are united in promoting the increased choice and convenience enabled by e-commerce;" (9) NetCoalition, "the public policy voice" for providers of internet search technology, hosting services, ISPs, and Web portal services; and (10) United States Internet Service Provider Association, a national trade association that represents major American ISPs and network communications providers. (R. 28-1, Am. Motion for Leave at 2.)

## II.    The Pleadings

Craigslist operates a website that allows third-party users to post and read notices for, among other things, housing sale or rental opportunities. (R. 1-1, Pl.'s Compl. at ¶7; R. 13-1, Def.'s Ans. at ¶7.) The website, which is accessible at "chicago.craigslist.org" (among other web addresses), is titled "craigslist:   chicago classifieds for jobs, apartments, personals, for sale, services, community:  Non-commercial bulletin board for events, jobs, housing, personal ads and community discussion." (R. 1-1, Pl.'s Compl. at ¶7; R. 13-1, Def.'s Ans. at ¶7.) The website contains a link entitled "post to classifieds" that, if clicked, will display a webpage located at

"post.craigslist.org/chi" and titled "<u>chicago craigslist</u> >> create posting." (R. 1-1, Pl.'s Compl. at

¶8; R. 13-1, Def.'s Ans. at ¶8.) That webpage categorizes posts and advertisements and offers the

following links: (1) "job," (2) "gigs," (3) "housing," (4) "for sale/wanted," (5) "resume," (6)

"services offered," (7) "personal/romance," (8) "community," and (9) "event." The webpage also

contains additional links labeled "<u>log into your account</u>" and "(<u>Apply for Account</u>)." (R. 1-1, Pl.'s

Compl. at ¶8; R. 13-1, Def.'s Ans. at ¶8.)

When a user clicks on the website link "housing," the website will display a page located at

"post.craigslist.org/chi/H" that bears the title "<u>chicago craigslist</u> > housing > create posting" and

contains a line reading "Are you offering space/housing, or do you need space/housing?" (R. 1-1,

Pl.'s Compl. at ¶9; R. 13-1, Def.'s Ans. at ¶9.) On this webpage, directly under this quoted text,

there are two links labeled "I am offering housing" and "I need housing" as well as two other links

(at the upper right of the page) labeled "log into your account" and "(Apply for Account)." (R. 1-1,

Pl.'s Compl. at ¶9; R. 13-1, Def.'s Ans. at ¶9.)

When a user clicks on the link "I am offering housing," the website displays a page located

at "post.craigslist.org/chi/H?want=n," also titled "<u>chicago craigslist</u> > housing > create posting."

(R. 1-1, Pl.'s Compl. at ¶10; R. 13-1, Def.'s Ans. at ¶10.) This webpage contains a line reading:

"Your ad will expire in 7 days. Please choose a category:" followed by eight categorized links

entitled: (1) "rooms & shares," (2) "apartments for rent," (3) "housing swap," (4) "office &

commercial," (5) "parking & storage," (6) "real estate for sale," (7) "sublets & temporary," and (8)

"vacation rentals," as well as two other links (at the upper right of the page) labeled "log into your

account" and "(Apply for Account)." (R. 1-1, Pl.'s Compl. at ¶10; R. 13-1, Def.'s Ans. at ¶10.)

Accessing any of these links opens a new webpage making available suggested and "[r]equired"

fields that comprise the content of the post or advertisement. (R. 1-1, Pl.'s Compl. at ¶10.) These content fields list rent or price, specific and general location, the title of the advertisement, a contact email address, and a description with the capability to add pictures. (R. 1-1, Pl.'s Compl. at ¶10.)

The webpage further offers the option to "anonymize[]" a contact email address with a newly-assigned and unique email address using the domain name "craigslist.org." (R. 1-1, Pl.'s Compl. at ¶10.) When a user clicks on the link "I need housing" the website displays a webpage located at "post.craigslist.org/chi/H?want=y" that bears the title "chicago craigslist > housing > posting." This webpage categorizes posts and advertisements under links to the following: (1) "apts wanted," (2) "real estate wanted," (3) "room/share wanted," and (4) "sublet/temp wanted." (R. 1-1, Pl.'s Compl. at ¶11; R. 13-1, Def.'s Ans. at ¶11.) When a user clicks on these links, the webpage offers the option to anonymize a contact email address and the same suggested and "[r]equired" fields appear as when a user clicks on links associated with the "I am offering housing" link. (R. 1-1, Pl.'s Compl. at ¶11; R. 13-1, Def.'s Ans. at ¶11.) The webpage link titled "log in to your account," opens a webpage titled "craigslist: account log in" that lists an "Email/Handle" field and a "Password" field so that those with "craigslist accounts" may access their personal accounts, prior postings, responses to such postings, and other information. (R. 1-1, Pl.'s Compl. at ¶12; R. 13-1, Def.'s Ans. at ¶12.) This sign-in page has a line that reads "need help?" followed by a link that enables a user to send an email to the email address "accounts@craigslist.org." (R. 1-1, Pl.'s Compl. at ¶12; R. 13-1, Def.'s Ans. at ¶12.) The webpage link titled "Apply for Account," opens a new webpage located at "accounts.craigslist.org/login/signup," titled "craigslist: account signup," that directs individuals to type a five-letter verification word, to provide a contact email address, and to

click on a button to "create account" so that prior content and information may be saved and accessed later.  (R. 1-1, Pl.'s Compl. at ¶13; R. 13-1, Def.'s Ans. at ¶13.)  When home-seekers are interested in posted sale or rental housing opportunities, they obtain the necessary contact information from content published on Craigslist's website.  (R. 1-1, Pl.'s Compl. at ¶14.)

CLC alleges that, through the above-described process, Craigslist publishes housing advertisements on its website that indicate a preference, limitation, or discrimination, or an intention to make a preference, limitation, or discrimination, on the basis of race, color, national origin, sex, religion and familial status.  (*See also id.* ¶¶142-51 (alleging that CLC continuously monitors Craigslist's website and that it has diverted substantial time and money away from its fair housing program to efforts directed in response to Craigslist's publication of discriminatory housing advertisements).)  Here is a sampling of the allegedly objectionable statements within rental postings on Craigslist's website:

- "African Americans and Arabians tend to clash with me so that won't work out" (R. 1-1, Pl.'s Compl. at ¶17)

- "Neighborhood is predominantly Caucasian, Polish and Hispanic"  (*Id.* at ¶18)

- "NO MINORITIES"  (*Id.* at ¶19)

- "Non-Women of Color NEED NOT APPLY"  (*Id.* at  ¶21)

- "looking for gay latino"  (*Id.* at ¶24)

- "This is not in a trendy neighborhood – very Latino"  (*Id.* at ¶26)

- "This neighborhood is probably what you've heard . . . predominantly hispanic, but changing slowly"  (*Id.* at ¶27)

- "All in a vibrant southwest Hispanic neighborhood offering great classical Mexican culture, restaurants and businesses"  (*Id.* at ¶28)

- "Requirements:  Clean Godly Christian Male."  (*Id.* at ¶30)

- "Owner lives on the first floor, so tenant must be respectful of the situation, preferably not 2 guys in their mid twenties, who throw parties all the time" (*Id.* at ¶33)

- "LADIES PLEASE RENT FROM ME" (*Id.* at ¶34)

- "This is what I am looking for . . . and the more a candidate has, the less I will ask in rent: Female Christian" (*Id.* at ¶37)

- "Christian single straight female needed." (*Id.* at ¶39)

- "Only Muslims apply" (*Id.* at ¶40)

- "near St Gertrudes [sic] church" (*Id.* at ¶41)

- "Walk to shopping, restaurants, coffee shops, synagogue." (*Id.* at ¶43)

- "very quiet street opposite church" (*Id.* at ¶48)

- "Catholic Church, and beautiful Buddhist Temple within one block" (*Id.* at ¶54)

- "Apt. too small for families with small children" (*Id.* at ¶60)

- "Perfect for 4 Med students" (*Id.* at ¶61)

- "Perfect place for city single" (*Id.* at ¶63)

- "absolutely ideal for a young professional and socialite!" (*Id.* at ¶67)

- "Perfect for Young Family or 2 Broke ASS Roommates" (*Id.* at ¶79)

- "young cool landlord who wants one nice quiet person to rent her basement" (*Id.* at ¶81)

- "Non-smoking adults preferred" (*Id.* at ¶82)

CLC alleges that these and similar statements discourage or prohibit home-seekers from pursuing housing and thus decrease the number of units available to them. (*Id.* at ¶¶ 16, 20, 22, 29, 35, 59.)

**ANALYSIS**

## I.     The Statutes at Issue

### A.     The Fair Housing Act

To redress this alleged injury, CLC here seeks a declaratory judgment that Craigslist violated 42 U.S.C. §3604(c) ("Section 3604") of the FHA,[2] which "prohibits racial discrimination of all kinds in housing." *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 260 (7th Cir. 1996). Section 3604(c), in particular, makes it unlawful:

> To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

42 U.S.C. §3604(c). As the NFHA points out in its *amicus* submission, courts have held that Section 3604(c) applies to a variety of media, including newspapers, *see, e.g., Ragin v. New York Times Co.*, 923 F.2d 995, 999-1000 (2d Cir. 1991), brochures, *Saunders v. Gen. Servs. Corp.*, 659 F. Supp. 1042, 1057-59 (E.D. Va. 1987), multiple listing services, *Wheatley Heights Neighborhood Coalition v. Jenna Resales Co.*, 447 F. Supp. 838, 842 n.3 (E.D.N.Y. 1978), telecommunication devices for the deaf, *United States v. Space Hunters, Inc.*, 429 F.3d 416, 420 (2d Cir. 2005), a housing complex's "pool and building rules," *Fair Hous. Cong. v. Weber*, 993 F. Supp. 1286, 1289-91 (C.D. Cal. 1997),

---

[2]      CLC also seeks an injunction that bars Craigslist from continuing to publish discriminatory notices and further requires, among other things, that Craigslist: (1) develop a non-discriminatory policy that states, at a minimum, that all submissions to its website are subject to federal fair housing laws, (2) post a short statement on its website summarizing Craigslist's non-discrimination policy, (3) report to the U.S. Department of Housing and Urban Development and to CLC any individual or entity seeking to post a discriminatory housing advertisement on Craigslist's website, (4) delete accounts and prevent website access to individuals who post or attempt to post discriminatory housing advertisements, and (5) implement screening software to preclude discriminatory advertisements from being published on Craigslist's website. (*Id.* at 18-20.)

as well as "any other publishing medium." *United States v. Hunter*, 459 F.2d 205, 211 (4th Cir.

1972). (R. 17-2, NFHA's Br. at 8-9.) Along the same lines, the United States Department of

Housing and Urban Development ("HUD") has issued a regulation[3] construing Section 3604(c) as

applying to "[w]ritten notices and statements includ[ing] any applications, flyers, brochures, deeds,

signs, banners, posters, billboards or any documents used with respect to the sale or rental of a

dwelling." 24 C.F.R. §100.75.

B.      **The Communications Decency Act**

Notwithstanding the FHA's broad scope, Craigslist argues that Plaintiff's Complaint fails

on the pleadings because of the immunity afforded under Section 230(c)(1) of the CDA. Section

230(c) consists of two operative provisions, each under the subheading "Protection for Blocking and

Screening of Offensive Materials:"[4]

---

[3]      The Secretary of HUD retains the "authority and responsibility for administering" the FHA, 42 U.S.C. §3608, and may promulgate regulations to carry out the FHA, 42 U.S.C. §3614a.

[4]      In the two subsections immediately preceding Section 230(c), Congress identified certain findings and policies:

(a) Findings. The Congress finds the following: (1) The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens. (2) These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops. (3) The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity. (4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation. (5) Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

(b) Policy. It is the policy of the United States – (1) to promote the continued development of the Internet and other interactive computer services and other interactive media; (2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation; (3) to encourage the development of technologies which maximize user control over what

-10-

(c) Protection for "good samaritan" blocking and screening of offensive material

    (1) Treatment of publisher or speaker

        No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

    (2) Civil liability

        No provider or user of an interactive computer service shall be held liable on account of –

            (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

            (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

47 U.S.C. 230(c).[5] These provisions preempt contrary state law, but do not "prevent any State from enforcing any State law that is consistent with this section." 47 U.S.C. §230(e)(3). In addition, Section 230 exempts certain areas of law from its scope, but the FHA is not among them. *See* 47

---

information is received by individuals, families, and schools who use the Internet and other interactive computer services; (4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and (5) to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

47 U.S.C. §230(a), (b).

    [5]    Section 230(f) defines certain terms in Section 230(c). As is relevant here, the statute defines: (1) "interactive computer service" to mean "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server . . .;" and (2) "information content provider" to mean "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. §§230(f)(2), (f)(3).

U.S.C. §§230(e)(1), (2), (4) (excluding intellectual property laws, criminal laws, and the Electronic

Privacy Act).

## II.     Previous Cases

Near-unanimous case law holds that Section 230(c) affords immunity to ICSs against suits

that seek to hold an ICS liable for third-party content.  The fountainhead of this uniform authority

is *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997), the first case to address Section

230(c)(1)'s scope.  In *Zeran*, a user sought to hold AOL, an ISP, liable for posting defamatory

speech that originated from a third party.  *Id.* at 329.  The user contended that once he notified AOL

of the defamatory posting that "AOL had a duty to remove the defamatory posting promptly, to

notify its subscribers of the message's false nature, and to effectively screen future defamatory

material."  *Id.* at 330.  The Fourth Circuit held that Section 230 barred the user's claim:

> The relevant portion of § 230 states: "No provider or user of an interactive computer
> service shall be treated as the publisher or speaker of any information provided by
> another information content provider." 47 U.S.C. § 230(c)(1).  By its plain language,
> §230 creates a federal immunity to any cause of action that would make service
> providers liable for information originating with a third-party user of the service.
> Specifically, §230 precludes courts from entertaining claims that would place a
> computer service provider in a publisher's role.  Thus, lawsuits seeking to hold a
> service provider liable for its exercise of a publisher's traditional editorial functions
> – such as deciding whether to publish, withdraw, postpone or alter content – are
> barred.

*Id.* at 328-30 (stating also that "Section 230 [ ] plainly immunizes computer service providers like

AOL from liability for information that originates with third parties").  In support of this holding,

the *Zeran* court cited the "purpose of this statutory immunity," something the court deemed "not

difficult to discern:"

> Congress recognized the threat that tort-based lawsuits pose to freedom of speech in
> the new and burgeoning Internet medium.  The imposition of tort liability on service
> providers for the communications of others represented, for Congress, simply

another form of intrusive government regulation of speech. Section 230 was enacted, in part, to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum.

\* \* \*

Congress made a policy choice, however, not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages.

Congress' purpose in providing the § 230 immunity was thus evident. Interactive computer services have millions of users. The amount of information communicated via interactive computer services is therefore staggering. The specter of tort liability in an area of such prolific speech would have an obvious chilling effect. It would be impossible for service providers to screen each of their millions of postings for possible problems. Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted. Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.

*Id.* at 330-31 (internal citation omitted). Virtually all subsequent courts that have construed Section

230(c)(1) have followed *Zeran,*[6] and several have concluded that Section 230(c)(1) offers ICSs a

---

[6] *See Green v. America Online*, 318 F.3d 465, 470-71 (3ᵈ Cir. 2003); *Batzel v. Smith*, 333 F.3d 1018, 1031 n.18 (9th Cir. 2003); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122-25 (9th Cir. 2003); *Ben Ezra, Weinstein & Co. v. America Online, Inc.*, 206 F.3d 980, 984-85 (10th Cir. 2000); *Blumenthal v. Drudge*, 992 F. Supp. 44, 51-52 (D.D.C. 1998); *Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 500-01 (E.D. Pa. 2006); *Dimeo v. Max*, 433 F. Supp. 2d 523, 530-31 (E.D. Pa. 2006); *Whitney Info. Network, Inc. v. Verio, Inc.*, No. 2:04CV462FTM29SPC, 2006 WL 66724, *2-3 (M.D. Fla. Jan. 11, 2006); *Associated Bank-Corp. v. Earthlink, Inc.*, No. 05-C-0233-S, 2005 WL 2240952, **3-4 (W.D. Wis. Sept. 13, 2005); *Morrison v. American Online, Inc.*, 153 F. Supp. 2d 930, 932-34 (N.D. Ind. 2001); *Barnes v. Yahoo!, Inc.*, No. Civ. 05-926-AA, 2005 WL 3005602, **2-3 (D. Or. Nov. 8, 2005); *Landry-Bell v. Various, Inc.*, No. Civ.A. 05-1526, 2005 WL 3640448, **1-3 (W.D. La. Dec. 27, 2005); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1117-18 (W.D. Wash. 2004); *MCW, Inc. v. Badbusinessbureau.com, LLC*, No. Civ.A.3:02-CV-2727-G, 2004 WL 833595, **7-8 (N.D. Tex. Apr. 19, 2004); *Noah v. AOL Time Warner, Inc.*, 261 F.Supp.2d 532, 537-38 (E.D. Va. 2003); *Smith v. Intercosmos Media Group, Inc.*, No. Civ.A. 02-1964, 2002 WL 31844907, **3-4 (E.D. La. Dec. 17, 2002); *Patentwizard, Inc. v. Kinko's, Inc.*, 163 F. Supp. 2d 1069, 1071 (D.S.D. 2001); *Marczeski v. Law*, 122 F. Supp. 2d 315, 327 (D. Conn. 2000); *Donato v. Moldow*, 374 N.J. Super. 475, 487-500, 865 A.2d 711, 718-27 (N.J. Sup. Ct. App. Div. 2005); *Austin v. Crystaltech Web Hosting*, 211 Ariz. 569, 573-74, 125 P.3d 389, 393-94 (Ariz. Ct. App. 2005); *Barrett v. Fonorow*, 343 Ill. App. 3d 1184, 1193-94, 279 Ill. Dec. 113, 121, 799 N.E.2d 916, 924 (Ill. Ct. App. 2003); *Doe v. America Online, Inc.*, 783 So.2d 1010, 1012-17 (Fla. 2001); *Schneider v. Amazon.com, Inc.*, 108 Wash. App. 454, 459-67, 31 P.3d 37, 39-43

"broad," "robust" immunity.[7]

In *Doe v. GTE Corp.*, 347 F.3d 655, 659-60 (7th Cir. 2003), however, the Seventh Circuit

called *Zeran*'s holding into doubt. In the underlying proceedings, the district court followed *Zeran*

and held that Section 230(c)(1) barred the plaintiffs' cause of action:

> [W]hat Plaintiffs ignore is that by seeking to hold GTE and PSINet liable for their
> decision not to restrict certain content it is seeking to hold them liable in a
> publisher's capacity. Section 230(c)(1) . . . "creates a federal immunity to any cause
> of action that would make service providers liable for information originating with
> a third-party user of the service lawsuits seeking to hold a service provider liable for
> its exercise of a publisher's traditional editorial functions-such as deciding whether
> to publish, withdraw, postpone or alter content-are barred." Thus, because Plaintiffs
> seek to hold GTE and PSINet liable for their "own conduct" as publishers, GTE and
> PSINet may avail themselves of the CDA's immunity in this action under §230(c)(1).

\*       \*       \*

_____

(Wash. Ct. App. Sept. 17, 2001); *Doe One v. Oliver*, 46 Conn. Supp. 406, 410-11, 755 A.2d 1000, 1003-04 (Conn. Sup. Ct. 2000); *see also Novak v. Overture Servs., Inc.*, 309 F. Supp. 2d 446, 452-53 (E.D.N.Y. 2004) (citing *Carafano* instead of *Zeran*, but to the same effect); *Beyond Sys., Inc. v. Keynetics, Inc.*, 422 F. Supp. 2d 523. 536-37 (D. Md. 2006) (CDA preempted the Maryland Commerical Electronic Mail Act and noting that "[c]ase law clearly establishes that CDA immunity applies even where an ISP knew of its customers' potentially illegal activity"); *cf. Barrett v. Rosenthal*, 114 Cal. App. 4th 1379, 9 Cal. Rptr. 3d 142, 150-67 (Cal. Ct. App. 2004) (disagreeing with *Zeran*'s holding).

[7]     *Carafano*, 339 F.3d at 1123-24 (noting that "[Section] 230(c) provides broad immunity" and that "reviewing courts have treated § 230(c) immunity as quite robust:" "[u]nder § 230(c), therefore, so long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process"); *Batzel*, 333 F.3d at 1031 n.19 (describing Section 230 as creating a "broad immunity"); *Ben Ezra*, 206 F.3d at 984-85 (Section 230 "creates a federal immunity to any state law cause of action that would hold computer service providers liable for information originating with a third party"); *Barnes*, 2005 WL 3005602 at *2 ("There can be no dispute that in the nine years since Section 230 was enacted that courts across the country have held that Section 230 generally bars claims that seek to hold the provider of an interactive computer service liable for tortuous [*sic*] or unlawful information that someone else disseminates using that service."); *cf. MCW*, 2004 WL 833595 at *7 ("Under this statutory scheme, Congress has immunized interactive computer services from any cause of action that would make them liable for publishing information provided by a third-party user of the service. Section 230(c) immunity is not so broad as to extend to an interactive computer service that goes beyond the traditional publisher's role and takes an active role in creating or developing the content at issue."); *see also Fair Housing Council of San Fernando Valley v. Roommate.com, LLC*, No. CV 03-09386PA, 2004 WL 3799488, *3-4 (C.D. Cal. Sept. 30, 2004) (finding that Section 230(c)(1) barred cause of action brought under Section 3604(c)).

The Court agrees with Defendants . . . [t]he CDA creates federal immunity against any state law cause of action that would hold computer service providers liable for information originating from a third party.

*Doe v. GTE Corp.*, 99 C 7895, 2000 WL 816779, *4 (N.D. Ill. June 26, 2000) (quoting *Zeran*, 129 F.3d at 330); *see also GTE*, 347 F.3d at 659 ("The district court held that subsection (c)(1), though phrased as a definition rather than as an immunity, also blocks civil liability when web hosts and other Internet service providers (ISPs) *refrain* from filtering or censoring the information on their sites." (emphasis original)).

The Seventh Circuit affirmed the district court's decision, but, in (self-acknowledged) *dicta*, it questioned the district court's reliance on *Zeran*:

> Franco [a third party] provided the offensive material; GTE [the ICS] is not a "publisher or speaker" as § 230(c)(1) uses those terms; therefore, the district court held, GTE cannot be liable under any state-law theory to the persons harmed by Franco's material. This approach has the support of four circuits. No appellate decision is to the contrary.
>
> If this reading is sound, then § 230(c) as a whole makes ISPs indifferent to the content of information they host or transmit: whether they do (subsection (c)(2)) or do not (subsection (c)(1)) take precautions, there is no liability under either state or federal law. As precautions are costly, not only in direct outlay but also in lost revenue from the filtered customers, ISPs may be expected to take the do-nothing option and enjoy immunity under § 230(c)(1). Yet § 230(c) – which is, recall, part of the "Communications Decency Act" – bears the title "Protection for 'Good Samaritan' blocking and screening of offensive material," hardly an apt description if its principal effect is to induce ISPs to do nothing about the distribution of indecent and offensive materials via their services. Why should a law designed to eliminate ISPs' liability to the creators of offensive material end up defeating claims by the victims of tortious or criminal conduct?
>
> True, a statute's caption must yield to its text when the two conflict, but *whether* there is a conflict is the question on the table. Why not read §230(c)(1) as a definitional clause rather than as an immunity from liability, and thus harmonize the text with the caption? On this reading, an entity would remain a "provider or user" – and thus be eligible for the immunity under § 230(c)(2) – as long as the information came from someone else; but it would become a "publisher or speaker" and lose the benefit of § 230(c)(2) if it created the objectionable information. The difference between this

reading and the district court's is that § 230(c)(2) never requires ISPs to filter offensive content, and thus § 230(e)(3) would not preempt state laws or common-law doctrines that induce or require ISPs to protect the interests of third parties, such as the spied-on plaintiffs, for such laws would not be "inconsistent with" this understanding of § 230(c)(1). There is yet another possibility: perhaps § 230(c)(1) forecloses any liability that depends on deeming the ISP a "publisher" – defamation law would be a good example of such liability – while permitting the states to regulate ISPs in their capacity as intermediaries.

*GTE*, 347 F.3d at 659-60 (emphasis original). In the end, however, the Seventh Circuit disposed of the appeal on other grounds and, thus, did not definitively determine which of the above constructions is proper. *Id.* (determining that the court "need not decide which understanding of § 230(c) is superior, because the difference matters only when some rule of state law does require ISPs to protect third parties who may be injured by material posted on their services" and finding that plaintiffs had not established that such a rule of law existed). That issue is now before the Court.[8]

### III.    The Scope of Section 230(c)(1)

The parties dispute the operative effect of Section 230(c)(1). CLC argues that, in line with *GTE*'s *dicta*, Section 230(c)(1) must be read only as a definitional clause that provides no immunity on its own, but rather determines the subset of ICSs that fall within the grant of immunity afforded under Section 230(c)(2). (R. 16-1, Pl.'s Resp. at 8 ("[u]nder [a] straight-forward reading of Section 230(c)(1), an interactive computer service provider would, if it created the offensive material, be subject to treatment as a speaker or publisher and thus understandably would 'lose the benefit' of civil liability protection under (c)(2) – because as the author of the content it could not credibly maintain that good faith efforts were made to prevent the offensive disclosure. But where an interactive computer service does not create the offensive information, it is merely the provider or

---

[8]    One court within the Seventh Circuit has addressed the scope of Section 230(c)(1) since *GTE*. *Associated Bank-Corp.*, 2005 WL 2240952 at *4. Although that case followed *Zeran*, it failed to discuss, or even cite, *GTE*. *Id.*

user, and will be entitled to civil liability protection only for its efforts to block and screen.").)

Craigslist, in contrast, argues that Section 230(c)(1) grants immunity as to all causes of action against an ICS (so long as the ICS is not the originator of the content at issue). (R. 15-1, Def.'s Motion at 2 ("As a matter of clear federal law, an entity such as [C]raigslist may not be held liable for unlawful content that, as here, originates not from [C]raigslist but from users of the [C]raiglist website. [C]raigslist falls squarely within the protection afforded by [Section 230], which broadly immunizes interactive computer service providers from liability for third-party content.").) The Court rejects both positions.[9]

---

[9]     After the parties had completed their briefing, CLC submitted as supplemental authority a one-page memorandum from Bryan Greene, HUD's Deputy Assistant Secretary for Enforcement and Programs. In that memorandum, Deputy Assistant Greene opines that Section 3604(c) applies to Internet postings notwithstanding Section 230(c)(1) of the CDA:

> [Section 3604(c)'s] prohibition applies to all advertising media, including newspapers, magazines, television, radio, and the Internet. Just as the Department has found newspapers in violation of the [FHA] for publishing discriminatory classifieds, the Department also has concluded that it is illegal for Web sites to publish discriminatory advertisements.

> Some Web sites assert that they are exempt from liability under Section [3604(c)] of the [FHA] because of a provision in the [CDA] . . ., which limits the liability of interactive computer services for content originating with a third party user of the service. Although the CDA does not state an intent to limit liability under the [FHA] or other civil rights states, some believe that Section 230 of the CDA gives Internet publishers immunity from lawsuits brought under federal and state civil rights statutes. However, HUD has concluded that the CDA does not make Web sites immune from liability under the [FHA] or from liability under state and local laws that HUD has certified as substantially equivalent to the [FHA].

(R. 41-1, Pl.'s Motion to Suppl., Ex. A. (Greene Memo to Fair Housing and Equal Opportunity Regional Directors dated Sept. 20, 2006).) CLC contends that this issuance is entitled to deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). (*See also* R. 16-1, CLC's Resp. at 3 n.1 (citing statements of HUD Assistant Secretary Kim Kendrick).)

     The Court finds this supplemental authority unpersuasive. Foremost, this authority is not an agency regulation, but rather is merely a non-binding agency opinion that carries no "conclusive mystique." *Sehie v. City of Aurora*, 432 F.3d 749, 753 (7th Cir. 2005) (informal administrative opinions are not binding: "Interpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference." (quoting *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct.

## A.     Rules of Statutory Construction

In analyzing the scope of Section 230(c)(1), the Court "must first look to the language of the statute and assume that its plain meaning accurately expresses the legislative purpose." *United States v. Miscellaneous Firearms, Explosives, Destructive Devices & Ammunition*, 376 F.3d 709, 712 (7th Cir. 2004) (internal quotation omitted); *see also Chicago Transit Auth. v. Adams*, 607 F.2d 1284, 1289 (7th Cir. 1979) ("Words are to be given their ordinary meaning absent persuasive reasons to the contrary."). "The plain meaning of a statute is conclusive unless literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Balint*, 201 F.3d 928, 932-33 (7th Cir. 2000); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*, 49 F.3d 323, 326-27 (7th Cir. 1995) ("We look first to the text for an answer. We look beyond the express language of a statute only where such language is ambiguous, or where a literal interpretation would lead to absurd results or thwart the goals of the statutory scheme."). "Therefore, [a court's] interpretation is guided not just by a single sentence or sentence fragment, but by the language of the whole law, and its object and policy." *Balint*, 201 F.3d at 932-33 (citing *Grammatico v. United States*, 109 F.3d 1198, 1204 (7th Cir. 1997)); *see Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S. Ct. 1291, 146 L. Ed. 2d 121 (2000) ("It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" (quoting *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809, 109 S. Ct. 1500, 103 L. Ed. 2d 891 (1989))).

---

1655, 146 L. Ed. 2d 621 (2000)) (internal citation omitted)). Moreover, the statutory grant of authority in 42 U.S.C. §§3608 and 3614a does not grant the HUD Secretary the authority to interpret the CDA. *See also id.* ("agency opinion letters cannot substitute for an act of Congress" (citing *Marshall v. Rosemont*, 584 F.2d 319, 321 (9th Cir. 1978))).

**B.      *Zeran* and Similar Authority**

With these principles in mind, the Court concludes that Section 230(c)(1) does not bar "any cause of action," as *Zeran* holds and as Craigslist contends, but instead is more limited – it bars those causes of action that would require treating an ICS as a publisher of third-party content.  Before explaining this conclusion, the Court will explain, respectfully, why it finds unpersuasive *Zeran* and the essentially uniform body of case law on point.  First and foremost, *Zeran* overstates the "plain language" of Section 230(c)(1):

> The relevant portion of §230 states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. §230(c)(1).  By its plain language, Section 230 creates *a federal immunity to any cause of action* that would make service providers liable for information originating with a third-party user of the service.

*Zeran*, 129 F.3d at 330 (emphasis added).  Section 230(c)(1) does not mention "immunity" or any similar term or phrase.  As such, it stands in stark contrast to Section 230(c)(2), which uses language that unequivocally creates immunity:  "no provider or user of an interactive computer service *shall be held liable* on account of . . ."[10]  Although such a glaring divergence in statutory language typically yields variant practical effects — *see Russello v. United States*, 464 U.S. 16, 23, 104 S. Ct. 296, 300 (1983) ("where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion;" for example, "[h]ad Congress intended to restrict § 1963(a)(1) to

---

[10]      Section 230(e)(3) and 47 U.S.C. §223(f)(1), another statute passed as part of the Communications Decency Act, also use more direct language than that found in Section 230(c)(1).  *See* 47 U.S.C. §230(e)(3) ("No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."); 47 U.S.C. §223(f)(1) ("No cause of action may be brought in any court or administrative agency against any person on account of any activity that is not in violation of any law punishable by criminal or civil penalty, and that the person has taken in good faith to implement a defense authorized under this section or otherwise to restrict or prevent the transmission of, or access to, a communication specified in this section.").

an interest in an enterprise, it presumably would have done so expressly as it did in the immediately following subsection (a)(2)" (internal quotation omitted)) — *Zeran* does not address this divergence. The courts that have followed *Zeran* fail to address the divergence, as well. Instead, these later courts have merely latched on to *Zeran*'s language to hold that Section 230(c)(1) grants "broad," if not in fact limitless, immunity to claims against ICSs based on third-party content, irrespective of whether the claims at issue require "treat[ment] as a publisher." *See, e.g., Novak*, 309 F. Supp. 2d at 452-53 (E.D.N.Y. 2004) (Section 230(c)(1) barred claim for tortious interference with prospective economic advantage); *Noah*, 261 F. Supp. 2d at 538 (Section 230(c)(1) barred claims for intentional infliction of emotional distress, unjust enrichment, and fraud); *Whitney Info. Network*, 2006 WL 66724 at *2-3 (Section 230(c)(1) barred tortious interference with a business relationship claim).

In addition to containing overbroad language, *Zeran* also has an internal inconsistency. Immediately after the above-cited excerpt, the Fourth Circuit suggests that, rather than immunity to "any cause of action," Section 230(c)(1) applies to a smaller subset of ICSs:

> Specifically, §230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone or alter content – are barred.

This explanation implies that Section 230(c)(1)'s immunity applies only to causes of action that seek to impose liability when an ICS acts like a professional publisher (by editing content, choosing what material to post, and so on), and not those seeking to impose liability when an ICS acts like a "publisher" by making information generally known or by disseminating information to the public. *See, e.g.*, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 944 (10th Ed. 1999) (defining "publisher" as "one that publishes something; *esp*: a person or corporation whose business is publishing;" and

defining "publish" as: "1a: to make generally known; 1b: to make public announcement of; 2a: to disseminate to the public; 2b: to produce or release for distribution; *specif* PRINT; 2c: to issue the work of (an author)" (parentheses original)); *see also Blumenthal*, 992 F. Supp. at 52 (Section 230 forbids the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions). Put differently, the explanation *Zeran* offers in support of its "plain" reading is something narrower than an absolute grant of immunity because it fails to include ICSs that do not edit, or choose what to post, but who nonetheless serve as a conduit for third-party content.

This internal inconsistency not only lessens persuasiveness, but also creates problematic applications. *Zeran* holds that ICSs are immune from suit whenever they exercise the duties of a (professional) publisher by "alter[ing] content." *Zeran*, 129 F.3d at 330. In so holding, *Zeran* includes conduct within the scope of immunity that conflicts with statutory language. By *altering* content, an ISP would no longer be posting information provided by "*another* content provider"[11] – a prerequisite under Section 230(c)(1). 47 U.S.C. §230(c)(1) ("No provider . . . of an interactive computer service shall be treated as the publisher . . . of any information provided by *another* information content provider." (emphasis added)). This is not an idle concern. Courts have applied *Zeran*'s language to hold that Section 230(c)(1) immunizes ICSs *because* they alter third-party content, rather than analyzing whether it is the third-party content (which would fall within Section 230(c)(1)'s protection) or the ICS's alteration (which would not) that caused the alleged injury. *See, e.g., Dimeo*, 433 F. Supp. 2d at 530 (Section 230(c)(1) barred defamation claim where defendant edited third-party

---

[11]    Put differently, the ISP's *alteration*, because it is information created by the ISP itself, would not be entitled to protection under Section 230(c)(1). The ICS, however, still could not be "treated as the publisher" of the unaltered, underlying third-party content because that content would still be "information provided by *another* information content provider." And a plaintiff, to succeed on any claim, still would have to show that ISP's alteration is what caused any alleged injury.

content: "[b]ecause [plaintiff] alleges that [defendant] did no more than select and edit posts, we cannot consider him to be the 'provider' of the 'content' that [plaintiff] finds to be offensive"); *Donato*, 374 N.J. Super. at 489-500, 865 A.2d at 719-27 (Section 230(c)(1) barred claim against "electronic community bulletin board website" even though defendant "participated in selective editing, deletion, and re-writing of anonymously posted messages"); *see also Ben Ezra*, 206 F.3d at 985 (editing stock information provided by a third party did not transform defendant into an "information content provider"). Given the above-described overbreadth, internal inconsistency, and problematic applications, the Court respectfully declines to follow *Zeran*'s lead.[12]

### C.      The Proper Scope of Section 230(c)(1)

Putting *Zeran* aside, the Court begins its analysis by looking to the statute's text.[13] Section

---

[12]      In addition, by stating at one point that Section 230(c)(1) bars "any cause of action," *Zeran* seems unnecessarily at odds with the statutory text and related headings preceding it: "Protection for private blocking and screening of offensive material" and "Protection for 'Good Samaritan' blocking and screening of offensive material." *See GTE*, 347 F.3d at 660 (criticizing *Zeran*'s broad grant of immunity: "Yet § 230(c) – which is, recall, part of the "Communications Decency Act" – bears the title "Protection for 'Good Samaritan' blocking and screening of offensive material," hardly an apt description if its principal effect is to induce ISPs to do nothing about the distribution of indecent and offensive materials via their services. Why should a law designed to eliminate ISPs' liability to the creators of offensive material end up defeating claims by the victims of tortious or criminal conduct?"). Furthermore, it is the subheading for Section 230(c)(2), not Section 230(c)(1), that bears the title "Civil Liability."

[13]      The Court recognizes that the policies that *Zeran* identifies in support of broad immunity are reasonable, *see Zeran*, 129 F.3d at 330-31, but that alone cannot support a reading of the statute that finds no basis in the statute's text. *See, e.g., Aubert v. Am. Gen. Fin., Inc.*, 137 F.3d 976, 979 (7th Cir. 1998) (policy argument found unavailing because a court's "role, when the language of a statute is plain, is to enforce that statute according to its terms"); *Central States, Southeast and Southwest Areas Pension Fund v. Bell Transit Co.*, 22 F.3d 706, 710 (7th Cir. 1994) (courts "are bound by the particular rules enacted by Congress and are not free to carve out our own exceptions merely because we believe that they would best serve Congress' policies and goals"); *see also, e.g., Bd. of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 374, 106 S. Ct. 681, 689, 88 L. Ed. 2d 691 (1986) ("[i]nvocation of the 'plain purpose' of legislation at the expense of the terms of the statute itself takes no account of the [congressional] processes of compromise and, in the end, prevents the effectuation of congressional intent" – "[i]f the Bank Holding Company Act falls short of providing safeguards desirable or necessary to protect the public interest, that is a problem for Congress, and not . . . the courts, to address").

230(c)(1) provides that "[n]o provider . . . of an interactive computer service shall be treated as a publisher" – a term the CDA does not define – "for information provided by another information content provider." While this language does not grant immunity *per se*, *cf.* 47 U.S.C. §230(c)(2), it does prohibit treatment as a publisher, which, quite plainly, would bar any cause of action that requires, to establish liability, a finding that an ICS published third-party content. As the Seventh Circuit already has suggested, "defamation law would be a good example of such liability," *GTE*, 347 F.3d at 660; so too, as it turns out, are causes of action under Section 3604(c). 42 U.S.C. §3604(c) (rendering it illegal "[t]o make, print, *or publish*, or cause to be made, printed, *or published* any [discriminatory] notice, statement, or advertisement . . ." (emphasis added)).

This plain meaning of the statutory text is not at odds with the intentions of Section 230(c)(1)'s drafters. Indeed, Congress did not intend to grant a vast, limitless immunity, but rather enacted Section 230(c) specifically to overrule the court decision in *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995). *See, e.g.,* H.R. Conf. Rep. No. 104-458, at 194 (1996) ("One of the specific purposes of this section is to overrule *Stratton-Oakmont v. Prodigy* and any other similar decisions which have treated such providers and users as publishers or speakers of content that is not their own because they have restricted access to objectionable material. The conferees believe that [*Stratton Oakmont*] create[s] serious obstacles to the important federal policy of empowering parents to determine the content of communications their children receive through interactive computer services."). In that case, the court held that an internet access provider who used filtering technology could be held liable for libelous third-party statements posted on its bulletin board service. *Stratton Oakmont*, 1995 WL 323710 at **2-4 (determining that, under defamation law, Prodigy, an internet access provider, was a publisher rather than a distributor because "[b]y actively

utilizing technology and manpower to delete notes from its computer bulletin boards on the basis of offensiveness and 'bad taste' . . . PRODIGY is clearly making decisions as to content . . . and such decisions constitute editorial control").  Thus, when Congress enacted Section 230(c), it did so to address the problem of holding liable for defamation ICSs that reviewed third-party content (as in *Stratton Oakmont*), while leaving free from liability ICSs that did not review content.  *See, e.g., Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135, 139-41 (S.D.N.Y. 1991) (service provider not liable for third-party content because the provider was merely a conduit for the third-party's defamatory statements).  Even though Congress specifically aimed to overrule *Stratton Oakmont*, a defamation case, it did so by using language – a prohibition against "treat[ing] [an ICS] as a publisher" – that plainly bars any claim that requires "publishing" as an element.[14]  In any event, regardless of whether Congress choose Section 230(c)(1)'s language with the FHA in mind, what is important here is that the plain meaning of the statute *is not at odds* with Congress' intent.  *See Balint*, 201 F.3d at 932-33; *see also Lauer*, 49 F.3d at 326-27.  The Court's reading is at least as harmonious with congressional intent as either of the parties' proposed alternatives – Congress enacted Section 230(c)(1) to overrule *Stratton Oakmont,* not to create limitless immunity (as Craigslist suggests) or no immunity at all (as CLC suggests).

Other rules of statutory construction further support the Court's reading.  Limiting the immunity afforded under Section 230 to those claims that require "publishing" as an essential element – as opposed to *any* cause of action – gives effect to the different language in Sections 230(c)(1) and

---

[14]     The Court here is not attempting to define the full contours of the word "publisher" or what constitutes "treat[ment] as a publisher."

(c)(2).[15] *See Russello*, 464 U.S. at 23, 104 S. Ct. at 300; *Ahlers*, 305 F.3d at 59-60.  Moreover, the Court's reading does not clash with the statutory captions.  *See United States v. Tedder*, 403 F.3d 836, 844 (7th Cir. 2005) (statutory "[t]itles, headings, and captions may help disambiguate adopted texts, but they are not themselves rules of law").  Indeed, as the Seventh Circuit has observed, it seems rather unlikely that, in enacting the CDA and in trying to protect Good Samaritans from filtering offensive conduct, Congress would have intended a broad grant of immunity for ICSs that do *not* screen any third-party content whatsoever.  *GTE*, 347 F.3d at 660.  And because it is something less than an absolute grant of immunity, state legislatures may be able to enact, consistent with Section 230, initiatives[16] that induce or require online service providers to protect the interests of third parties (under *Zeran*'s holding, states cannot enact such initiatives because they would be inconsistent with

---

[15]     As further *dicta* in *GTE* suggests, however, the Court's construction likely is not the doomsday scenario that Craigslist and the Service Providers make it out to be.  Indeed, future plaintiffs likely will have a tough road to hoe even without an absolute grant of immunity to ICSs:

> Plaintiffs do not cite any case in any jurisdiction holding that a service provider must take reasonable care to prevent injury to third parties.  Consider the Postal Service or Federal Express, which sell transportation services that could be used to carry harmful articles.  As far as we can discover, no court has held such a carrier liable for failure to detect and remove harmful items from shipments . . . .  Similarly, telephone companies are free to sell phone lines to entities . . . without endeavoring to find out what use the customers make of the service . . . .  Yet an ISP, like a phone company, sells a communications service; it enabled Franco, [the defendant], to post a web site and conduct whatever business Franco chose.  That GTE supplied some inputs (server space, bandwidth, and technical assistance) into Franco's business does not distinguish it from the lessor of Franco's office space or the shipper of the tapes to its customers.  Landlord, phone company, delivery service, and web host all could learn, at some cost, what Franco was doing with the services and who was potentially injured as a result; but state law does not require these providers to learn, or to act as Good Samaritans if they do.  The common law rarely requires people to protect strangers, or for that matter acquaintances or employees.

*GTE*, 347 F.3d at 661.

[16]     The Court is not definitively reaching – because it need not – the issue of whether states may in fact enact such initiatives.

-25-

the statute and thus preempted under Section 230(e)(3)). *Id.* (because "[Section] 230(c)(2) never requires ISPs to filter offensive content . . . [Section] 230(e)(3) would not preempt state laws or common-law doctrines that induce or require ISPs to protect the interests of third parties, such as the spied-on plaintiffs, for such laws would not be 'inconsistent with' this understanding of § 230(c)(1)"). For all these reasons, the Court here holds that, at a minimum, Section 230(c)(1) bars claims, like the CLC's claim, that requires publishing as a critical element.[17]

### D.    Section 230(c)(1)'s Application

Applying Section 230(c)(1) here, CLC's claim fails on the pleadings.  First, Craigslist is a "provider . . . of an interactive computer service" because, as alleged in the Complaint, Craigstlist operates a website that multiple users have accessed to create allegedly discriminatory housing notices.  (R. 1-1, Pl.'s Compl. at ¶7.)  *See also* 47 U.S.C. §230(f)(2) (defining "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server").  These notices, in turn, are "information" that originates, not from Craigslist, but from "another information content provider," namely the users of Craigslist's website.  47 U.S.C. §230(f)(3) (defining "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service").  As a "provider . . . of an interactive computer service" that serves as a conduit for "information provided by another

---

[17]        Even though Section 230(c)(1) provides something less than absolute immunity, it nonetheless could also be a definitional clause, as CLC contends and as Judge Easterbrook alternatively suggests.  The two readings are not mutually exclusive.  Although Section 230(c)(1) could operate, consistent with the Court's holding, to define the scope of immunity under Section 230(c)(2), the Court need not reach that issue because, given the Court's construction of the statute, it is not essential to the current motion.  To be clear, the Court holds here that Section 230(c)(1) is not *only* a definitional clause or *only* a threshold to receiving immunity under Section 230(c)(2).  Whether it is such a definitional clause is an issue for another day.

information content provider," Craigslist "shall not be treated as a publisher."  47 U.S.C. §230(c)(1).  Because to hold Craigslist liable under Section 3604(c) would be to treat Craigslist as if it were the publisher of third-party content, the plain language of Section 230(c)(1) forecloses CLC's cause of action.[18]  *See also* 47 U.S.C. §230(e) (excluding certain laws from Section 230's scope, but not excluding the FHA); *Andrus v. Glover Const. Co.*, 446 U.S. 608, 616-17, 100 S. Ct. 1905, 1910 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.").

---

[18]    CLC and the NFHA contend that, even if the Court construes Section 230(c)(1) as barring claims that have "publishing" as an essential element, CLC's claim can proceed because Section 3604(c) also prohibits the "mak[ing]" and "print[ing]" of discriminatory housing notices.  (R. 16-1, Pl.'s Resp. at 17 n.19; R. 17-2, NFHA Br. at 11.)  The Court disagrees.  The Complaint cannot state a claim for relief under Section 3604(c) because, even when viewed in the most favorable light, Craigslist has not made or printed the notices at issue.  Craigslist did not "make" the notices because they originated from users of Craigslist's website, (R. 1-1, Pl.'s Compl. at ¶¶7-14), and it did not "print" them within any reasonable interpretation of that word, as defined when Congress enacted the FHA.  *See, e.g.,* WEBSTER'S THIRD NEW INT'L DICTIONARY (1981) (defining "print" as "1a: to make an impression in or upon . . . 1b: to make a copy by impressing paper against an inked printing surface or by an analogous method; 2b to perform or cause to be performed all or some of the operations necessary to the production of (as a publication, a piece of printed matter, a picture. . .")"; *see also Sanders v. Jackson*, 209 F.3d 998, 1000 (7th Cir. 2000) ("The cardinal rule is that words used in statutes must be given their ordinary and plain meaning.  We frequently look to dictionaries to determine the plain meaning of words, and in particular we look at how a phrase was defined at the time the statute was drafted and enacted.").  Perhaps recognizing that Craigslist's alleged conduct would not fit within the plain meaning of these terms, CLC asserts throughout its Complaint only that Craigslist "published" the notices at issue.  (*Id.* at ¶¶1, 14-153.)

## CONCLUSION

For these reasons, the Court grants Craigslist's Rule 12(c) motion for judgment on the pleadings.

Dated: November 14, 2006                    ENTERED


                                            _____
                                            AMY J. ST. EVE
                                            United States District Judge