**CERTIFIED COPY**

# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 07-1101

CHICAGO LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, INC.,

*Plaintiff-Appellant,*

v.

CRAIGSLIST, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 657—Amy J. St. Eve, *Judge.*

ARGUED FEBRUARY 15, 2008—DECIDED MARCH 14, 2008

Before EASTERBROOK, *Chief Judge,* and WOOD and EVANS, *Circuit Judges.*

EASTERBROOK, *Chief Judge.* Section 804(a) of the Fair Housing Act forbids discrimination on account of race, religion, sex, or family status when selling or renting housing. 42 U.S.C. §3604(a). This prohibition is accompanied by a ban on ads that state a preference with respect to any of the protected classes. It is illegal

> [t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or

advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

42 U.S.C. §3604(c). The Chicago Lawyers' Committee for Civil Rights Under Law, on behalf of its members, contends in this suit that craigslist, which provides an electronic meeting place for those who want to buy, sell, or rent housing (and many other goods and services), is violating this statute.

Some notices on craigslist proclaim "NO MINORITIES" and "No children", along with multiple variations, bald or subtle. Many who offer housing for sale or rent satisfy 42 U.S.C. §3603(b)(1), which exempts "any single-family house sold or rented by an owner . . . [who] does not own more than three such single-family houses". Although this exemption does not take single-family homes outside the scope of §3604(c), any rule that forbids truthful advertising of a transaction that would be substantively lawful encounters serious problems under the first amendment. See, e.g., *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, 527 U.S. 173 (1999); *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995); *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983); *Virginia Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976). But lots of notices posted on craigslist concern apartment buildings, condominiums, and single-family homes owned by someone who has a portfolio of four or more rental properties. Section 3604(c) applies to these ads without constitutional cavil. Courts regularly enforce the statute against newspapers and other publishers. See, e.g.,

*United States v. Hunter*, 459 F.2d 205, 211–12 (4th Cir. 1972); *Mayers v. Ridley*, 465 F.2d 630, 633 (D.C. Cir. 1972); cf. *Ragin v. New York Times Co.*, 923 F.2d 995 (2d Cir. 1991).

Online services are in some respects like the classified pages of newspapers, but in others they operate like common carriers such as telephone services, which are unaffected by §3604(c) because they neither make nor publish any discriminatory advertisement, text message, or conversation that may pass over their networks. Ditto courier services such as FedEx and UPS, which do not read the documents inside packages and do not make or publish any of the customers' material. Web sites are not common carriers, but screening, though lawful, is hard. Simple filters along the lines of "postings may not contain the words 'white'" can't work. Statements such as "red brick house with white trim" do not violate any law, and prospective buyers and renters would be worse off if craigslist blocked descriptive statements.

An online service could hire a staff to vet the postings, but that would be expensive and may well be futile: if postings had to be reviewed before being put online, long delay could make the service much less useful, and if the vetting came only after the material was online the buyers and sellers might already have made their deals. Every month more than 30 million notices are posted to the craigslist system. Fewer than 30 people, all based in California, operate the system, which offers classifieds and forums for 450 cities. It would be necessary to increase that staff (and the expense that users must bear) substantially to conduct the sort of editorial review that the Lawyers' Committee demands—and even then errors would be frequent.

One of the ads to which the Lawyers' Committee objects contains the phrase "Catholic Church and beautiful

Buddhist Temple within one block". The Committee sees this as a signal of religious preference; craigslist sees it as a description of the neighborhood, helping people zero in on properties most attractive to their preferences and no more implying exclusion than "elementary school within five minutes' walk" implies that the landlord won't rent to childless couples. Automated filters and human reviewers may be equally poor at sifting good from bad postings unless the discrimination is blatant; both false positives and false negatives are inevitable.

According to craigslist, the effort is unnecessary. It relies on 47 U.S.C. §230(c), a part of the Communications Decency Act of 1996. This subsection provides:

> **Protection for "Good Samaritan" blocking and screening of offensive material.**
>
> **(1) Treatment of publisher or speaker.** No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.
>
> **(2) Civil liability.** No provider or user of an interactive computer service shall be held liable on account of—(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

As craigslist understands this statute, §230(c)(1) provides "broad immunity from liability for unlawful third-party content." That view has support in other circuits. See *Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997); *Ben Ezra, Weinstein & Co. v. America Online, Inc.*, 206 F.3d 980 (10th Cir. 2000); *Green v. America Online*, 318 F.3d 465 (3d Cir. 2003); *Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003); *Universal Communication Systems, Inc. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007). We have questioned whether §230(a)(1) creates any form of "immunity," see *Doe v. GTE Corp.*, 347 F.3d 655 (7th Cir. 2003), and the Lawyers' Committee takes *Doe* as its cue. The caption of subsection (c) as a whole refers to "blocking and screening"; the Lawyers' Committee insists that unless an information content provider uses some form of filtering (a brief way to refer to "blocking and screening"), all of §230(c) is irrelevant.

Neither side's argument finds much support in the statutory text. Subsection (c)(1) does not mention "immunity" or any synonym. Our opinion in *Doe* explains why §230(c) as a whole cannot be understood as a general prohibition of civil liability for web-site operators and other online content hosts:

> Section 230(c)(2) tackles this problem [of potential liability for hosting pornographic pictures] not with a sword but with a safety net. A web host that *does* filter out offensive material is not liable to the censored customer. Removing the risk of civil liability may induce web hosts and other informational intermediaries to take more care to protect the privacy and sensibilities of third parties. The district court held that subsection (c)(1), though phrased as a definition rather than as an immunity, also blocks civil liability when web

hosts and other Internet service providers (ISPs) *refrain* from filtering or censoring the information on their sites. . . .

If this reading is sound, then §230(c) as a whole makes ISPs indifferent to the content of information they host or transmit: whether they do (subsection (c)(2)) or do not (subsection (c)(1)) take precautions, there is no liability under either state or federal law. As precautions are costly, not only in direct outlay but also in lost revenue from the filtered customers, ISPs may be expected to take the do-nothing option and enjoy immunity under §230(c)(1). Yet §230(c)—which is, recall, part of the "Communications Decency Act"—bears the title "Protection for 'Good Samaritan' blocking and screening of offensive material", hardly an apt description if its principal effect is to induce ISPs to do nothing about the distribution of indecent and offensive materials via their services. Why should a law designed to eliminate ISPs' liability to the creators of offensive material end up defeating claims by the victims of tortious or criminal conduct?

True, a statute's caption must yield to its text when the two conflict, see *Trainmen v. Baltimore & Ohio R.R.*, 331 U.S. 519, 528–29 (1947), but *whether* there is a conflict is the question on the table. Why not read §230(c)(1) as a definitional clause rather than as an immunity from liability, and thus harmonize the text with the caption? See *Carlisle v. United States*, 517 U.S. 416, 421 (1996). On this reading, an entity would remain a "provider or user"—and thus be eligible for the immunity

No. 07-1101 7

> under §230(c)(2)—as long as the information came from someone else; but it would become a "publisher or speaker" and lose the benefit of §230(c)(2) if it created the objectionable information. The difference between this reading and the district court's is that §230(c)(2) never requires ISPs to filter offensive content, and thus §230(e)(3) would not preempt state laws or common-law doctrines that induce or require ISPs to protect the interests of third parties, . . . for such laws would not be "inconsistent with" this understanding of §230(c)(1). There is yet another possibility: perhaps §230(c)(1) forecloses any liability that depends on deeming the ISP a "publisher"—defamation law would be a good example of such liability—while permitting the states to regulate ISPs in their capacity as intermediaries.

347 F.3d at 659–60 (emphasis in original). To appreciate the limited role of §230(c)(1), remember that "information content providers" may be liable for contributory infringement if their system is designed to help people steal music or other material in copyright. See *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005); *In re Aimster Copyright Litigation*, 334 F.3d 643 (7th Cir. 2003). *Grokster* is incompatible with treating §230(c)(1) as a grant of comprehensive immunity from civil liability for content provided by a third party.

While craigslist wants to expand §230(c)(1) beyond its language, the Lawyers' Committee proposes to limit its scope to screening under subsection (c)(2). Yet subsection (c)(2) does not deal with the liability of speakers and publishers, the subject of subsection (c)(1). We read each to do exactly what it says. So did the district court. A

natural reading of §230(a)(1) in conjunction with §3604(c) led that court to grant summary judgment for craigslist. 461 F. Supp. 2d 681 (N.D. Ill. 2006).

What §230(c)(1) says is that an online information system must not "be treated as the publisher or speaker of any information provided by" someone else. Yet only in a capacity as publisher could craigslist be liable under §3604(c). It is not the author of the ads and could not be treated as the "speaker" of the posters' words, given §230(a)(1). The Lawyers' Committee responds that "nothing in §230's text or history suggests that Congress meant to immunize an ISP from liability under the Fair Housing Act. In fact, Congress did not even remotely contemplate discriminatory housing advertisements when it passed §230." That's true enough, but the reason a legislature writes a general statute is to avoid any need to traipse through the United States Code and consider all potential sources of liability, one at a time. The question is not whether Congress gave any thought to the Fair Housing Act, but whether it excluded §3604(c) from the reach of §230(c)(1). Cf. *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 126–27 (1974) (Congress need not think about a subject for a law to affect it; effect of general rules continues unless limited by superseding enactments).

Section 230(c)(1) is general. Although the impetus for the enactment of §230(c) as a whole was a court's opinion holding an information content provider liable, as a publisher, because it had exercised some selectivity with respect to the sexually oriented material it would host for customers, a law's scope often differs from its genesis. Once the legislative process gets rolling, interest groups seek (and often obtain) other provisions.

Congress could have written something like: "No provider or user of an interactive computer service shall

be treated as the publisher or speaker of any *sexually oriented material* provided by another information content provider." That is not, however, what it enacted. Where the phrase "sexually oriented material" appears in our rephrasing, the actual statute has the word "information." That covers ads for housing, auctions of paintings that may have been stolen by Nazis, biting comments about steroids in baseball, efforts to verify the truth of politicians' promises, and everything else that third parties may post on a web site; "information" is the stock in trade of online service providers.

Almost in passing, the Lawyers' Committee insists that craigslist can be liable as one who "cause[d] to be made, printed, or published any [discriminatory] notice, statement, or advertisement". Doubtless craigslist plays a causal role in the sense that no one could post a discriminatory ad if craigslist did not offer a forum. That is not, however, a useful definition of cause. One might as well say that people who save money "cause" bank robbery, because if there were no banks there could be no bank robberies. An interactive computer service "causes" postings only in the sense of providing a place where people can post. Causation in a statute such as §3604(c) must refer to causing a particular statement to be made, or perhaps the discriminatory content of a statement. That's the sense in which a non-publisher can cause a discriminatory ad, while one who causes the forbidden content may not be a publisher. Nothing in the service craigslist offers induces anyone to post any particular listing or express a preference for discrimination; for example, craigslist does not offer a lower price to people who include discriminatory statements in their postings. If craigslist "causes" the discriminatory notices, then so do phone companies and courier services (and, for that matter, the firms that make

the computers and software that owners use to post their notices online), yet no one could think that Microsoft and Dell are liable for "causing" discriminatory advertisements.

Using the remarkably candid postings on craigslist, the Lawyers' Committee can identify many targets to investigate. It can dispatch testers and collect damages from any landlord or owner who engages in discrimination. See *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982); *Gladstone, Realtors v. Bellwood*, 441 U.S. 91 (1979). It can assemble a list of names to send to the Attorney General for prosecution. But given §230(c)(1) it cannot sue the messenger just because the message reveals a third party's plan to engage in unlawful discrimination.

**AFFIRMED**

the computers and software that owners use to post their notices online), yet no one could think that Microsoft and Dell are liable for "causing" discriminatory advertisements.

Using the remarkably candid postings on craigslist, the Lawyers' Committee can identify many targets to investigate. It can dispatch testers and collect damages from any landlord or owner who engages in discrimination. See *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982); *Gladstone, Realtors v. Bellwood*, 441 U.S. 91 (1979). It can assemble a list of names to send to the Attorney General for prosecution. But given §230(c)(1) it cannot sue the messenger just because the message reveals a third party's plan to engage in unlawful discrimination.

**AFFIRMED**